# SAN DIEGO GAS & ELECTRIC CO. *v.* CITY OF SAN DIEGO ET AL.

No. 79–678. Argued December 1, 1980—Decided March 24, 1981

.BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, REHNQUIST, and STEVENS, JJ., joined. REHNQUIST, J., filed a concurring opinion, *post*, p. 633. BRENNAN, J., filed a dissenting opinion, in which STEWART, MARSHALL, and POWELL, JJ., joined, *post*, p. 636.

*Louis E. Goebel* argued the cause for appellant. With him on the briefs were *Gordon Pearce* and *Guenter S. Cohn.*

*C. Alan Sumption* argued the cause for appellees. With him on the brief was *John W. Witt.**

---

*Briefs of *amici curiae* urging reversal were filed by *Gus Bauman* for the National Association of Home Builders et al.; by *Gideon Kanner, Thomas J. Houser,* and *Janice S. Amundson* for the National Association of Manufacturers of the United States of America; by *Richard S. Wasserstrom* for the National Forest Products Association; by *Ronald A. Zumbrun* and *Thomas E. Hookano* for the San Diego Urban League, Inc.; and by *Daniel J. Popeo* and *Paul D. Kamenar* for the Washington Legal Foundation.

Briefs of *amici curiae* urging affirmance were filed by *Solicitor General McCree, Assistant Attorney General Moorman, Deputy Solicitor General Claiborne, Elinor Hadley Stillman, J. Vance Hughes, Ann P. Gailis,* and *E. Robert Wright* for the United States; by *J. D. MacFarlane,* Attorney General of Colorado, and *Marshall D. Brodsky,* Assistant Attorney General; *Richard S. Gebelein,* Attorney General of Delaware, *Regina M. Small,* State Solicitor, and *June D. McArtor,* Deputy Attorney General; *Wayne Minami,* Attorney General of Hawaii; *Tyrone C. Fahner,* Attorney General of Illinois, and *George W. Wolff,* Assistant Attorney General; *William J. Guste, Jr.,* Attorney General of Louisiana, and *Gary Keyser,* Assistant Attorney General; *Richard S. Cohen,* Attorney General of Maine, and *Cabanne Howard,* Assistant Attorney General; *Stephen H. Sachs,* Attorney General of Maryland, and *Paul F. Strain* and *Thomas A. Deming,* Deputy Attorneys General; *Francis X. Bellotti,* Attorney General of Massachu-

Justice Blackmun delivered the opinion of the Court.

Appellant San Diego Gas & Electric Company, a California corporation, asks this Court to rule that a State must provide a monetary remedy to a landowner whose property allegedly has been "taken" by a regulatory ordinance claimed to violate the Just Compensation Clause of the Fifth Amendment.[1] This question was left open last Term in *Agins* v. *City of Tiburon*, 447 U. S. 255, 263 (1980). Because we conclude that we lack jurisdiction in this case, we again must leave the issue undecided.

setts, and *Stephen M. Leonard,* Assistant Attorney General; *Warren Spannaus,* Attorney General of Minnesota, and *Kent Harbison,* Special Assistant Attorney General; *Richard H. Bryan,* Attorney General of Nevada, and *Stephen C. Balkenbush,* Deputy Attorney General; *Robert Abrams,* Attorney General of New York; *William J. Brown,* Attorney General of Ohio, and *Colleen Nissl,* Assistant Attorney General; *John M. Brown,* Attorney General of Oregon, *John R. McCulloch, Jr.,* Solicitor General, and *William F. Gary,* Deputy Solicitor General; *M. Jerome Diamond,* Attorney General of Vermont, and *Benson D. Scotch,* Assistant Attorney General; *Slade Gorton,* Attorney General of Washington, and *Charles B. Roe, Jr.,* Senior Assistant Attorney General; *Bronson C. La Follette,* Attorney General of Wisconsin, and *Linda Bochert,* Assistant Attorney General, for the State of Colorado et al.; by *John J. Degnan,* Attorney General, *Stephen Skillman,* Assistant Attorney General, and *Deborah T. Poritz,* and *Richard M. Hluchan,* Deputy Attorneys General, for the State of New Jersey; by *John H. Larson* and *Paul T. Hanson* for the County of Los Angeles; by *Robert J. Logan* for the City of San Jose, California, et al.; by *E. Clement Shute, Jr.,* for the California Coastal Commission et al.; by *David Bonderman, Christopher J. Duerksen,* and *Antonio Rossmann* for the Conservation Foundation et al.; and by *Peter Van N. Lockwood* and *Edward P. Thompson, Jr.,* for the National Trust for Historic Preservation et al.

[1] "[N]or shall private property be taken for public use, without just compensation."

The Fifth Amendment's prohibition applies against the States through the Fourteenth Amendment. *Chicago, B., & Q. R. Co.* v. *Chicago,* 166 U. S. 226, 239 (1897); *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith,* 449 U. S. 155, 160 (1980).

## I

Appellant owns a 412-acre parcel of land in Sorrento Valley, an area in the northwest part of the city of San Diego, Cal. It assembled and acquired the acreage in 1966, at a cost of about $1,770,000, as a possible site for a nuclear power plant to be constructed in the 1980's. Approximately 214 acres of the parcel lie within or near an estuary known as the Los Penasquitos Lagoon.[2] These acres are low-lying land which serves as a drainage basin for three river systems. About a third of the land is subject to tidal action from the nearby Pacific Ocean. The 214 acres are unimproved, except for sewer and utility lines.[3]

When appellant acquired the 214 acres, most of the land was zoned either for industrial use or in an agricultural "holding" category.[4] The city's master plan, adopted in 1967, designated nearly all the area for industrial use.

Several events that occurred in 1973 gave rise to this litigation. First, the San Diego City Council rezoned parts of the property. It changed 39 acres from industrial to agricultural, and increased the minimum lot size in some of the agricultural areas from 1 acre to 10 acres. The Council

[2] Appellant claims that only the 214 acres have been taken by the city of San Diego. Throughout this opinion, "the property" and any similar phrase refers to this smaller portion of the 412 acres owned by appellant.

[3] Apparently other portions of the 412-acre parcel have been developed to some extent, and some parts sold.

[4] The city had classified 116 acres as M–1A (industrial) and 112 acres as A–1–1 (agricultural). The latter classification was reserved for "undeveloped areas not yet ready for urbanization and awaiting development, those areas where agricultural usage may be reasonably expected to persist or areas designated as open space in the general plan." San Diego Ordinance No. 8706 (New Series) § 101.0404 (1962), reproduced in Brief for Appellees C–1. A small amount of the land was zoned for residential development. (These figures total more than 214 acres. When the California courts described the zoning of the property, they did not distinguish between the 214 acres that allegedly were taken and 15 other acres that the trial court found had been damaged by the severance.)

recommended, however, that 50 acres of the agricultural land be considered for industrial development upon the submission of specific development plans.

Second, the city, pursuant to Cal. Gov't Code Ann. § 65563 (West Supp. 1981), established an open-space plan. This statute required each California city and county to adopt a plan "for the comprehensive and long-range preservation and conservation of open-space land within its jurisdiction." The plan adopted by the city of San Diego placed appellant's property among the city's open-space areas, which it defined as "any urban land or water surface that is essentially open or natural in character, and which has appreciable utility for park and recreation purposes, conservation of land, water or other natural resources or historic or scenic purposes." App. 159. The plan acknowledged appellant's intention to construct a nuclear power plant on the property, stating that such a plant would not necessarily be incompatible with the open-space designation.[5] The plan proposed, however, that the city acquire the property to preserve it as parkland.

Third, the City Council proposed a bond issue in order to obtain funds to acquire open-space lands. The Council identified appellant's land as among those properties to be acquired with the proceeds of the bond issue. The proposition, however, failed to win the voters' approval. The open-space plan has remained in effect, but the city has made no attempt to acquire appellant's property.

On August 15, 1974, appellant instituted this action in the Superior Court for the County of San Diego against the city and a number of its officials. It alleged that the city had

[5] The portion of the plan that discussed the Los Penasquitos Lagoon area stated: "[T]he San Diego Gas & Electric Company has a large (240 acre) ownership which it intends to utilize as the location of a nuclear power plant sometime in the 1980's. . . . [S]uch a facility, if sensitively designed and sited, could be compatible with open space preservation in this subsystem; however, a number of approvals and clearances must be obtained prior to the plant's construction becoming a reality." App. 160.

taken its property without just compensation, in violation of the Constitutions of the United States and California. Appellant's theory was that the city had deprived it of the entire beneficial use of the property through the rezoning and the adoption of the open-space plan. It alleged that the city followed a policy of refusing to approve any development that was inconsistent with the plan, and that the only beneficial use of the property was as an industrial park, a use that would be inconsistent with the open-space designation.[6] The city disputed this allegation, arguing that appellant had never asked its approval for any development plan for the property. It also contended that, as a charter city, it was not bound by the open-space plan, even if appellant's proposed development would be inconsistent with the plan, citing Cal. Gov't Code Ann. §§ 65700, 65803 (West 1966 and Supp. 1981).

Appellant sought damages of $6,150,000 in inverse condemnation, as well as mandamus and declaratory relief. Prior to trial, the court dismissed the mandamus claim, holding that "mandamus is not the proper remedy to challenge the validity of a legislative act." . Clerk's Tr. 42. After a nonjury trial on the issue of liability, the court granted judgment for appellant, finding that:

> "29. [Due to the] continuing course of conduct of the defendant City culminating in June of 1973, and, in particular, the designation of substantially all of the subject property as open space . . . , plaintiff has been deprived of all practical, beneficial or economic use of the property designated as open space, and has further suffered severance damage with respect to the balance of the subject property.

---

[6] Appellant abandoned its plan to construct a nuclear power plant after the discovery of an off-shore fault that rendered the project unfeasible. Tr. 73. Its witnesses acknowledged that only about 150 acres were usable as an industrial park, and that 1.25 million cubic yards of fill would be needed to undertake such a development. *Id.*, at 711, 905.

"30. No development could proceed on the property designated as open space unless it was consistent with open space. In light of the particular characteristics of the said property, there exists no practical, beneficial or economic use of the said property designated as open space which is consistent with open space.

"31. Since June 19, 1973, the property designated as open space has been devoted to use by the public as open space.

"32. Following the actions of the defendant City in June of 1973, it would have been totally impractical and futile for plaintiff to have applied to defendant City for the approval of any development of the property designated as open space or the remainder of the subject property.

"33. Since the actions of the defendant City in June of 1973, the property designated as open space and the remainder of the larger parcel is unmarketable in that no other person would be willing to purchase the property, and the property has at most a nominal fair market value." App. 41–42.

The court concluded that these findings established that the city had taken the property and that just compensation was required by the Constitutions of both the United States and California. A subsequent jury trial on the question of damages resulted in a judgment for appellant for over $3 million.

On appeal, the California Court of Appeal, Fourth District, affirmed. App. to Juris. Statement B–1; see 146 Cal. Rptr. 103 (1978). It held that neither a change in zoning nor the adoption of an open-space plan automatically entitled a property owner to compensation for any resulting diminution in the value of the property. In this case, however, the record revealed that the city followed the policy of enacting and enforcing zoning ordinances that were consistent with its

open-space plan. The Court of Appeal also found that the evidence supported the conclusion that industrial use was the only feasible use for the property and that the city would have denied any application for industrial development because it would be incompatible with the open-space designation. Appellant's failure to present a plan for developing the property therefore did not preclude an award of damages in its favor. The Court of Appeal, with one judge dissenting, denied the city's petition for rehearing. See 146 Cal. Rptr., at 118.

The Supreme Court of California, however, on July 13, 1978, granted the city's petition for a hearing. This action automatically vacated the Court of Appeal's decision, depriving it of all effect. *Knouse* v. *Nimocks*, 8 Cal. 2d 482, 483–484, 66 P. 2d 438 (1937). See also Cal. Rules of Court 976 (d) and 977 (West 1981). Before the hearing, the Supreme Court in June 1979 retransferred the case to the Court of Appeal for reconsideration in light of the intervening decision in *Agins* v. *City of Tiburon*, 24 Cal. 3d 266, 598 P. 2d 25 (1979), aff'd, 447 U. S. 255 (1980).[7] The California court in *Agins* held that an owner who is deprived of substantially all beneficial use of his land by a zoning regulation is not entitled to an award of damages in an inverse condemnation proceeding. Rather, his exclusive remedy is invalidation of the regulation in an action for mandamus or declaratory relief.[8] *Agins* also

---

[7] The retransfer order cited *Agins* as 23 Cal. 3d 605. App. to Juris. Statement E-1. The court's opinion, however, later was modified and reprinted with the citations noted in the text.

[8] Contrary to the dissent's argument, the California Supreme Court's *Agins* decision did not hold that a zoning ordinance never could be a "taking" and thus never could violate the Just Compensation Clause. It simply *limited the remedy* available for any such violation to nonmonetary relief. Immediately following the passage quoted by the dissent, *post*, at 640–641, that court stated:

"This conclusion is supported by a leading authority (1 Nichols, Eminent Domain (3d rev. ed. 1978) Nature and Origin of Power, § 1.42 (1), pp. 1–116—1–121), who expresses his view in this manner: 'Not only is an

held that the plaintiffs in that case were not entitled to such relief because the zoning ordinance at issue permitted the building of up to five residences on their property. Therefore, the court held, it did not deprive those plaintiffs of substantially all reasonable use of their land.[9]

When the present case was retransferred, the Court of Appeal, in an unpublished opinion, reversed the judgment of the Superior Court. App. 63. It relied upon the California decision in *Agins* and held that appellant could not recover compensation through inverse condemnation. It, however,

---

actual physical appropriation, under an attempted exercise of the police power, in practical effect an exercise of the power of eminent domain, but if regulative legislation is so unreasonable or arbitrary as virtually to deprive a person of the complete use and enjoyment of his property, it comes within the purview of the law of eminent domain. *Such legislation is an invalid exercise of the police power since it is clearly unreasonable and arbitrary. It is invalid as an exercise of the power of eminent domain since no provision is made for compensation.*" 24 Cal. 3d, at 272, 598 P. 2d, at 28. (Emphasis added by the California court.)
See also *id.*, at 273–274, 598 P. 2d, at 29:

"While acknowledging the power of government to preserve and improve the quality of life for its citizens through the regulation of the use of private land, we cannot countenance the service of this legitimate need through the uncompensated destruction of private property rights."
And see *id.*, at 276, 598 P. 2d, at 30:

" 'Determining that a particular land-use control requires compensation is an appropriate function of the judiciary. . . . But it seems a usurpation of legislative power for a court to force compensation,' " quoting Note, Inverse Condemnation: Its Availability in Challenging the Validity of a Zoning Ordinance, 26 Stan. L. Rev. 1439, 1451 (1974).

When *Agins* was appealed here, we unanimously agreed that "[t]he State Supreme Court determined that the appellants could not recover damages for inverse condemnation even if the zoning ordinances constituted a taking. The court stated that only mandamus and declaratory judgment are remedies available to such a landowner." 447 U. S., at 263. We believe, therefore, that it is the dissent that "fundamentally mischaracterizes," *post*, at 637, the California ruling.

[9] This Court's affirmance of the California court's judgment in *Agins* was on the ground that there was no taking. 447 U. S., at 263.

did not invalidate either the zoning ordinance or the open-space plan. Instead, it held that factual disputes precluded such relief on the present state of the record:

"[Appellant] complains it has been denied all use of its land which is zoned for agriculture and manufacturing but lies within the open space area of the general plan. It has not made application to use or improve the property nor has it asked [the] City what development might be permitted. Even assuming no use is acceptable to the City, [appellant's] complaint deals with the alleged overzealous use of the police power by [the] City. Its remedy is mandamus or declaratory relief, not inverse condemnation. [Appellant] did in its complaint seek these remedies asserting that [the] City had arbitrarily exercised its police power by enacting an unconstitutional zoning law and general plan element or by applying the zoning and general plan unconstitutionally. However, on the present record these are disputed fact issues not covered by the trial court in its findings and conclusions. They can be dealt with anew should [appellant] elect to retry the case." App. 66.

The Supreme Court of California denied further review. App. to Juris. Statement I–1. Appellant appealed to this Court, arguing that the Fifth and Fourteenth Amendments require that compensation be paid whenever private property is taken for public use. Appellant takes issue with the California Supreme Court's holding in *Agins* that its remedy is limited to invalidation of the ordinance in a proceeding for mandamus or declaratory relief. We postponed consideration of our jurisdiction until the hearing on the merits. 447 U. S. 919 (1980). We now conclude that the appeal must be dismissed because of the absence of a final judgment.[10]

---

[10] Title 28 U. S. C. § 1257 grants jurisdiction to this Court to review only "[f]inal judgments or decrees rendered by the highest court of a State in which a decision could be had." Because the finality requirement

## II

In *Agins,* the California Supreme Court held that mandamus or declaratory relief is available whenever a zoning regulation is claimed to effect an uncompensated taking in violation of the Fifth and Fourteenth Amendments. The Court of Appeal's failure, therefore, to award such relief in this case clearly indicates its conclusion that the record does not support appellant's claim that an uncompensated taking has occurred.[11] Because the court found that the record presented "disputed fact issues not covered by the trial court in its findings and conclusions," App. 66,[12] it held that manda-

---

of § 1257 applies to this Court's review of state-court judgments both by appeal and by certiorari, we do not address the city's contention that, inasmuch as the Court of Appeal did not uphold any statute against a constitutional challenge, this is not a proper appeal under § 1257 (2).

[11] We recognize that this is inconsistent with the Court of Appeal's first ruling in this case, but, as has been noted, that decision was deprived of all effect by the Supreme Court's order granting a hearing.

The dissent's statement that the Court of Appeal "concluded as a matter of law that no Fifth Amendment 'taking' had occurred," *post,* at 645, is premised upon its misreading of the *Agins* opinion. See n. 8, *supra.* The Court of Appeal simply refused to award appellant the only remedy held to be available for a "taking" because there were disputed factual issues to be resolved.

[12] Although its initial opinion affirmed the trial court's finding that any application by appellant to develop the property would have been rejected, it is clear that the Court of Appeal reconsidered that finding in the light of *Agins.* In *Agins,* the California Supreme Court held that landowners who had not "made application to use or improve their property" following the passage of a zoning ordinance and had not "sought or received any definitive statement as to how many dwelling units they could build on their land," 24 Cal. 3d, at 271, 598 P. 2d, at 27, had not shown that the ordinance took their property without just compensation, since it permitted up to five residences to be built on the plaintiffs' property. We agreed that no violation of the Fifth and Fourteenth Amendments had been shown, since the landowners were "free to pursue their reasonable investment expectations by submitting a development plan to local officials." 447 U. S., at 262.

In this case, city witnesses testified that some development of appellant's property would be consistent with the open-space plan. App. 134–

mus and declaratory relief would be available "should [appellant] elect to retry the case." *Ibid.* While this phrase appears to us to be somewhat ambiguous, we read it as meaning that appellant is to have an opportunity on remand to convince the trial court to resolve the disputed issues in its favor. We do not believe that the Court of Appeal was holding that judgment *must* be entered for the city. It certainly did not so direct. This indicates that appellant is free to pursue its quest for relief in the Superior Court. The logical course of action for an appellate court that finds unresolved factual disputes in the record is to remand the case for the resolution of those disputes. We therefore conclude that the Court of Appeal's decision contemplates further proceedings in the trial court.[13]

## III

Ever since this Court's decision in *Grays Harbor Co.* v. *Coats-Fordney Co.*, 243 U. S. 251 (1917), a state court's

---

135, 140, 149–150. Indeed, the plan holds out the possibility that a nuclear power plant could be built on the site, see n. 5, *supra*, and the witnesses testified that other forms of industrial development might be permitted as well. App. 140, 149–150. The trial court's opinion does not explain why it concluded in light of this evidence that any attempt to obtain the city's permission for development of the property would be futile.

When the Court of Appeal reconsidered its decision in light of *Agins*, we believe that its reference to "disputed fact issues not covered by the trial court in its findings," App. 66, referred to this controversy. Its opinion states that damages would be unavailable "[e]ven assuming no use is acceptable to the City." *Ibid.* The Court of Appeal declined to award mandamus or declaratory relief because it could not make this "assumption" in light of the factual disputes.

[13] Appellant's counsel shares this view:

"QUESTION: Mr. Goebel, your second and third cause of action in your complaint were petitions for mandate and the relief prayed in paragraph 3 of your complaint was that the Court order the City of San Diego to set aside the rezoning and to set aside the adoption of the open space element of its general plan. As I understand it, on remand, the trial court may grant that relief, theoretically.

"MR. GOEBEL: That's correct, Your Honor." Tr. of Oral Arg. 18.

holding that private property has been taken in violation of the Fifth and Fourteenth Amendments and that further proceedings are necessary to determine the compensation that must be paid has been regarded as a classic example of a decision not reviewable in this Court because it is not "final." In such a case, "the remaining litigation may raise other federal questions that may later come here." *Radio Station WOW, Inc.* v. *Johnson,* 326 U. S. 120, 127 (1945). This is because "the federal constitutional question embraces not only a taking, but a taking on payment of just compensation. A state judgment is not final unless it covers both aspects of that integral problem." *North Dakota Board of Pharmacy* v. *Snyder's Drug Stores, Inc.,* 414 U. S. 156, 163 (1973).

This case presents the reverse aspect of that situation. The Court of Appeal has decided that monetary compensation is not an appropriate remedy for any taking of appellant's property that may have occurred, but it has not decided whether any other remedy is available because it has not decided whether any taking in fact has occurred. Thus, however we might rule with respect to the Court of Appeal's decision that appellant is not entitled to a monetary remedy— and we are frank to say that the federal constitutional aspects of that issue are not to be cast aside lightly—further proceedings are necessary to resolve the federal question whether there has been a taking at all. The court's decision, therefore, is not final, and we are without jurisdiction to review it.

Because § 1257 permits us to review only "[f]inal judgments or decrees" of a state court, the appeal must be, and is, dismissed.
*It is so ordered.*

JUSTICE REHNQUIST, concurring.

If I were satisfied that this appeal was from a "final judgment or decree" of the California Court of Appeal, as that term is used in 28 U. S. C. § 1257, I would have little difficulty in agreeing with much of what is said in the dissenting

opinion of JUSTICE BRENNAN. Indeed, the Court's opinion notes that "the federal constitutional aspects of that issue are not to be cast aside lightly. . . ." *Ante,* at 633.

But "the judicial Power of the United States" which is vested in this Court by Art. III of the Constitution is divided by that article into original jurisdiction and appellate jurisdiction. With respect to appellate jurisdiction, Art. III provides:

"In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make."

The particular "regulation" of our appellate jurisdiction here relevant is found in 28 U. S. C. § 1257, which provides:

"Final judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court as follows:

.         .         .         .         .

"(2) By appeal, where is drawn in question the validity of a statute of any state on the ground of its being repugnant to the Constitution, treaties or laws of the United States, and the decision is in favor of its validity."

The principal case construing § 1257 is *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469 (1975), from which I dissented on the issue of finality. In *Cox,* the Court said:

"The Court has noted that '[c]onsiderations of English usage as well as those of judicial policy' would justify an interpretation of the final-judgment rule to preclude review 'where anything further remains to be determined by a State court, no matter how dissociated from the only federal issue that has finally been adjudicated by the highest court of the State.' *Radio Station WOW, Inc.* v. *Johnson,* 326 U. S. 120, 124 (1945). But

the Court there observed that the rule had not been administered in such a mechanical fashion and that there were circumstances in which there had been 'a departure from this requirement of finality for federal appellate jurisdiction.' *Ibid.*

"These circumstances were said to be 'very few,' *ibid.;* but as the cases have unfolded, the Court has recurringly encountered situations in which the highest court of a State has finally determined the federal issue present in a particular case, but in which there are further proceedings in the lower state courts to come. There are now at least four categories of such cases in which the Court has treated the decision of the federal issue as a final judgment for the purposes of 28 U. S. C. § 1257 and has taken jurisdiction without awaiting the completion of the additional proceedings anticipated in the lower state courts." *Id.,* at 477.

In *Cox,* the Court stated that the fourth category of cases which fell within the ambit of § 1257 finality were "those situations where the federal issue has been finally decided in the state courts with further proceedings pending in which the party seeking review here might prevail on the merits on nonfederal grounds, thus rendering unnecessary review of the federal issue by this Court, and where reversal of the state court on the federal issue would be preclusive of any further litigation on the relevant cause of action rather than merely controlling the nature and character of, or determining the admissibility of evidence in, the state proceedings still to come. In these circumstances, if a refusal to immediately review the state-court decision might seriously erode federal policy, the Court has entertained and decided the federal issue, which itself has been finally determined by the state courts for purposes of the state litigation." *Id.,* at 482–483.

I am not sure under how many of the four exceptions of

*Cox* JUSTICE BRENNAN may view this case as falling, but it seems to me that this case illustrates the problems which arise from a less-than-literal reading of the language "final judgment or decree." The procedural history of this case in the state courts is anomalous, to say the least, and it has resulted in a majority of this Court concluding that the California courts have not decided whether any taking in fact has occurred, *ante,* at 631, n. 11, and JUSTICE BRENNAN concluding that the Court of Appeal has held that the city of San Diego's course of conduct could not effect a "taking" of appellant's property. *Post,* at 661, n. 27. Having read the characterization of the California court proceedings in the opinion of this Court and in the opinion of JUSTICE BRENNAN as carefully as I can, I can only conclude that they disagree as to what issues remain open on remand from the State Court of Appeal to the Superior Court, but agree that such proceedings may occur.

Under these circumstances, it seems to me to be entirely in accord with the language of 28 U. S. C. § 1257, though perhaps not entirely in accord with the above-quoted portion of the opinion in *Cox Broadcasting Corp.* v. *Cohn, supra,* to conclude that this appeal is not from a "final judgment or decree." I would feel much better able to formulate federal constitutional principles of damages for land-use regulation which amounts to a taking of land under the Eminent Domain Clause of the Fifth Amendment if I knew what disposition the California courts finally made of this case. Because I do not, and cannot at this stage of the litigation, know that, I join the opinion of the Court today in which the appeal is dismissed for want of a final judgment.

JUSTICE BRENNAN, with whom JUSTICE STEWART, JUSTICE MARSHALL, and JUSTICE POWELL join, dissenting.

Title 28 U. S. C. § 1257 limits this Court's jurisdiction to review judgments of state courts to "[f]inal judgments or

decrees rendered by the highest court of a State in which a decision could be had." The Court today dismisses this appeal on the ground that the Court of Appeal of California, Fourth District, failed to decide the federal question whether a "taking" of appellant's property had occurred, and therefore had not entered a final judgment or decree on that question appealable under § 1257. Because the Court's conclusion fundamentally mischaracterizes the holding and judgment of the Court of Appeal, I respectfully dissent from the Court's dismissal and reach the merits of appellant's claim.

I

In 1966, appellant assembled a 412-acre parcel of land as a potential site for a nuclear power plant. At that time, approximately 116 acres of the property were zoned for industrial use, with most of the balance zoned in an agricultural holding category. In 1967, appellee city of San Diego adopted its general plan designating most of appellant's property for industrial use. In 1973, the city took three critical actions which together form the predicate of the instant litigation: it down-zoned some of appellant's property from industrial to agricultural; it incorporated a new open-space element in its plan that designated about 233 acres of appellant's land for open-space use; [1] and it prepared a report mapping appellant's property for purchase by the city for open-space use, contingent on passage of a bond issue. App. 49.

Appellant filed suit in California Superior Court alleging, *inter alia*, a "taking" of its property by "inverse condemnation" in violation of the United States and California Consti-

---

[1] The city's plan defined "open space" as "any urban land or water surface that is essentially open or natural in character, and which has appreciable utility for park and recreation purposes, conservation of land, water or other natural resources or historic or scenic purposes." App. 52, n. 3.

tutions,[2] and seeking compensation of over $6 million. After a nonjury trial on liability, the court held that appellee city had taken a portion of appellant's property without just compensation, thereby violating the United States and California Constitutions. *Id.*, at 42–43. A subsequent jury trial on damages resulted in a judgment of over $3 million, plus interest as of the date of the "taking," and appraisal, engineering, and attorney's fees. *Id.*, at 46.

The California Court of Appeal, Fourth District, affirmed, holding that there was "substantial evidence to support the court's conclusion [that] there was inverse condemnation." *Id.*, at 54. The California Supreme Court granted the city's petition for a hearing, App. to Juris. Statement D–1, but later transferred the case back to the Court of Appeal for reconsideration in light of *Agins* v. *City of Tiburon*, 24 Cal. 3d 266, 598 P. 2d 25 (1979), aff'd, 447 U. S. 255 (1980). App. to Juris. Statement E–1. Expressly relying on *Agins*, the

---

[2] The phrase "inverse condemnation" generally describes a cause of action against a government defendant in which a landowner may recover just compensation for a "taking" of his property under the Fifth Amendment, even though formal condemnation proceedings in exercise of the sovereign's power of eminent domain have not been instituted by the government entity. *Agins* v. *City of Tiburon*, 447 U. S. 255, 258, n. 2 (1980); *United States* v. *Clarke*, 445 U. S. 253, 257 (1980). See, *e. g.*, Cal. Civ. Proc. Code Ann. § 1245.260 (West Supp. 1981). In the typical condemnation proceeding, the government brings a judicial or administrative action against the property owner to "take" the fee simple or an interest in his property; the judicial or administrative body enters a decree of condemnation and just compensation is awarded. See *ibid.* See generally 6 J. Sackman, Nichols' Law of Eminent Domain § 24.1 (rev. 3d ed. 1980). In an "inverse condemnation" action, the condemnation is "inverse" because it is the landowner, not the government entity, who institutes the proceeding.

"Eminent domain" is the "power of the sovereign to take property for public use without the owner's consent." *Id.*, § 1.11, at 1–7. Formal proceedings initiated by the government are loosely referred to as either "eminent domain" or "condemnation" proceedings. See *Agins* v. *City of Tiburon, supra*, at 258, n. 2.

Court of Appeal this time reversed the Superior Court, holding:

"Unlike the person whose property is taken in eminent domain, the individual who is deprived of his property due to the state's exercise of its police power is not entitled to compensation. . . . A local entity's arbitrary unconstitutional exercise of the police power which deprives the owner of the beneficial use of his land does not require compensation; rather the party's remedy is administrative mandamus. . . ." App. 65–66.

The California Supreme Court denied further review. App. to Juris. Statement I–1.

## II

The Court today holds that the judgment below is not "final" within the meaning of 28 U. S. C. § 1257 because, although the California Court of Appeal "has decided that monetary compensation is not an appropriate remedy for any taking of appellant's property that may have occurred, . . . it has not decided whether any other remedy is available because *it has not decided whether any taking in fact has occurred." Ante,* at 633 (emphasis added). With all due respect, this conclusion misreads the holding of the Court of Appeal. In faithful compliance with the instructions of the California Supreme Court's opinion in *Agins* v. *City of Tiburon, supra,* the Court of Appeal held that the city's exercise of its police power, however arbitrary or excessive, could not *as a matter of federal constitutional law* constitute a "taking" under the Fifth and Fourteenth Amendments, and therefore that there was no "taking" without just compensation in the instant case.

Examination of the Court of Appeal's opinion and the California Supreme Court's *Agins* opinion confirms this reading. As indicated above, the Court of Appeal noted that, "[u]nlike the person whose property is *taken* in eminent domain, the individual who is *deprived* of his property due

to the state's exercise of its police power is not entitled to compensation." App. 65–66 (emphasis added). Under the Court of Appeal's view, there can be no Fifth Amendment "taking" outside of the eminent domain context. Thus, a "local entity's arbitrary unconstitutional exercise of the police power which *deprives* the owner of the beneficial use of his land does not require compensation; rather the party's remedy is administrative mandamus." *Id.,* at 66 (emphasis added).[3]

The Court of Appeal's analysis was required by the California Supreme Court's opinion in *Agins* v. *City of Tiburon, supra.* There the court stated:

"Plaintiffs contend that the limitations on the use of their land imposed by the ordinance constitute an unconstitutional 'taking of [plaintiff's] property without payment of just compensation' for which an action in inverse condemnation will lie. *Inherent in the contention is the argument that a local entity's exercise of its police power which, in a given case, may exceed constitutional limits is equivalent to the lawful taking of property by eminent domain thereby necessitating the payment of compensation. We are unable to accept this argument* believing the preferable view to be that, while such governmental action is invalid because of its excess,

---

[3] One law review article, cited twice by the California Supreme Court in *Agins,* typifies this mode of analysis:

"[T]raditionally eminent domain and the police power have been treated as disjunctive. . . . The Constitution requires that just compensation be paid to landowners whose property has been condemned or taken by a government exercising its eminent domain power; if property is taken and no compensation awarded, the landowner is entitled to bring a so-called inverse condemnation action to compel payment. In contrast, under the police power constitutional requirements relate to the reasonableness of the relation between the means used and the ends sought; a landowner affected by an unreasonable regulation is entitled to bring an action challenging its validity." Note, Eldridge v. City of Palo Alto: Aberration or New Direction in Land Use Law?, 28 Hastings L. J. 1569, 1570 (1977) (footnotes omitted).

remedy by way of damages in eminent domain is not thereby made available." 24 Cal. 3d, at 272, 598 P. 2d, at 28 (brackets in original) (emphasis added).[4]

A landowner may not "elect to sue in inverse condemnation and thereby *transmute an excessive use of the police power*

---

[4] It is not merely linguistic coincidence that the California Supreme Court in *Agins* never analyzed the Tiburon zoning ordinance to determine whether a Fifth Amendment *"taking"* without just compensation had occurred. Instead, the court noted that "a zoning ordinance may be unconstitutional and subject to invalidation only when its effect is to *deprive* the landowner of substantially all reasonable use of his property," and that "[t]he ordinance before us had no such effect." 24 Cal. 3d, at 277, 598 P. 2d, at 31 (emphasis added). Throughout the *Agins* opinion as well as the Court of Appeal decision below are references to actions which "deprive" the landowner of property use, indicating that the California courts were proceeding under the Due Process Clauses of the Fifth and Fourteenth Amendments, and not the Just Compensation Clause. *Id.*, at 273, 277, 598 P. 2d, at 28, 31; App. 66. Indeed the California courts are not alone in concluding that a government's exercise of its regulatory police powers can never effect a "taking." Five years ago, the Court of Appeals of New York reached the same conclusion. See *Fred F. French Investing Co.* v. *City of New York*, 39 N. Y. 2d 587, 594–596, 350 N. E. 2d 381, 384–386, cert. denied and appeal dism'd, 429 U. S. 990 (1976). This Court described a subsequent New York Court of Appeals decision on review here as

"summarily reject[ing] any claim that the [New York City] Landmarks Law had 'taken' property without 'just compensation,' . . . indicating that there could be no 'taking' since the law had not transferred control of the property to the city, but only restricted appellants' exploitation of it. In that circumstance, the Court of Appeals held that appellants' attack on the law could prevail only if the law deprived appellants of their property in violation of the Due Process Clause of the Fourteenth Amendment." *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104, 120–121 (1978).

See Marcus, The Grand Slam Grand Central Terminal Decision: A *Euclid* for Landmarks, Favorable Notice for TDR and A Resolution of the Regulatory/Taking Impasse, 7 Ecology Law Quarterly 731, 749, n. 97 (1978). See generally Comment, Balancing Private Loss Against Public Gain to Test for a Violation of Due Process or a Taking without Just Compensation, 54 Wash. L. Rev. 315, 319–327 (1979).

*into a lawful taking* for which compensation in eminent domain must be paid." *Id.,* at 273, 598 P. 2d, at 28 (emphasis added).[5]

This Court therefore errs, I respectfully submit, when it concludes that the Court of Appeal "has not decided whether any taking in fact has occurred." *Ante,* at 633. For whatever the merits of the California courts' substantive rulings on the federal constitutional issue, see *infra,* at 646–661, it is clear that the California Supreme Court has held that California courts in a challenge, as here, to a police power regulation, are barred from holding that a Fifth Amendment *"taking"* requiring just compensation has occurred.[6] No set of factual

---

[5] In so ruling, the California Supreme Court expressly disapproved *Eldridge* v. *City of Palo Alto,* 57 Cal. App. 3d 613, 621, 129 Cal. Rptr. 575, 579 (1976), a Court of Appeal decision holding that "a valid zoning ordinance may nevertheless operate so oppressively as to amount to a taking, thus giving an aggrieved landowner a right to damages in inverse condemnation."

[6] Appellees agreed with this interpretation at oral argument:

"QUESTION: Well, suppose the California Supreme Court or all the courts in California declare the zoning statute unconstitutional as applied to this piece of property, that the City has unconstitutionally interfered with the use of this property.

"MR. SUMPTION: Yes, Your Honor.

"QUESTION: Now, has the California Supreme Court or the Court of Appeal precluded damages in that situation?

"MR. SUMPTION: Under those facts, without any actual use, without the other factors, denial of access or any direct and special interference with the landowner's attempt to use the property, I think that's a correct assessment, that the California Supreme Court would say, no, your remedy is to set aside the regulations.

"QUESTION: Well, they get set aside but meanwhile the landowner has not been able to use it for the purpose he wanted. The zoning ordinance has effectively precluded his use of the property and the Supreme Court has said so. No damages?

"MR. SUMPTION: No damages, Your Honor.

"QUESTION: *You say that's police power, not Fifth Amendment taking?*

circumstances, no matter how severe, can "transmute" an arbitrary exercise of the city's police power into a Fifth Amendment "taking." *Agins* v. *City of Tiburon, supra,* at 273, 598 P. 2d, at 28. This Court's focus on the last full paragraph of the Court of Appeal decision, *ante,* at 630, to support its conclusion is misplaced, because that paragraph merely raises the possibility that appellant may "elect to retry the case" on a different constitutional theory—an allegation of "overzealous use of the police power," App. 66. Whatever factual findings of the trial court might be relevant to that inquiry, they would have no bearing on a Fifth Amendment "taking" claim.[7]  Therefore, the Court's sugges-

"MR. SUMPTION: *In California, that's the rule*—" Tr. of Oral Arg. 54–55 (emphasis added).

This understanding is likewise shared by appellant and *amici.* See, *e. g.,* Brief for Appellant 17, 31, 36; Brief for National Association of Home Builders and California Building Industry as *Amici Curiae* 5, 7.

[7] The Court concludes from the last paragraph of the Court of Appeal's opinion that "appellant is free to pursue its quest for relief in the Superior Court. The logical course of action for an appellate court that finds unresolved factual disputes in the record is to remand the case for the resolution of those disputes." *Ante,* at 632.

It is true that, under California law, an *unqualified* reversal generally operates to remand the cause for a new trial on all remaining issues. *McDonough Power Equipment Co.* v. *Superior Court,* 8 Cal. 3d 527, 532, 503 P. 2d 1338, 1341 (1972); *De Hart v. Allen,* 26 Cal. 2d 829, 833, 161 P. 2d 453, 455–456 (1945); 5 Cal. Jur. 3d, Appellate Review § 587, pp. 303–304 (1973); see *Gospel Army* v. *Los Angeles,* 331 U. S. 543, 546 (1947).  However, a reviewing court may *qualify* its reversal and its intent must be divined from its opinion as a whole. *Stromer* v. *Browning,* 268 Cal. App. 2d 513, 518–519, 74 Cal. Rptr. 155, 158 (1968); 5 Cal. Jur. 3d, *supra,* § 588, at 304.

Here, the Court of Appeal suggested that, if appellee elected to retry the case, "disputed fact issues *not covered by the trial court in its findings and conclusions*" could be "dealt with anew." App. 66 (emphasis added).  In the original "Findings of Fact and Conclusions of Law," the trial court unequivocally found a Fifth Amendment "taking" without just compensation:

"The actions of defendant City against plaintiff's property were moti-

644

tion that "further proceedings are necessary to resolve the federal question whether there has been a taking at all," is plainly wrong. *Ante,* at 633.[8]

The trial court has held expressly that the "actions of defendant City . . . taken as a whole, constitute a *taking* of the portion of plaintiff's property designated as open space without due process of law and just compensation within the meaning of the California and United States constitutions."

---

vated to achieve a *public* purpose, namely, preservation of open space, without payment of just compensation and were so burdensome and oppressive as to deprive plaintiff of any practical, beneficial or economic use of the property designated as open space, and, therefore, taken as a whole, constitute a *taking* of the portion of plaintiff's property designated as open space without due process of law and just compensation within the meaning of the California and United States constitutions. . . ." *Id.,* at 42–43 (emphasis added).

By limiting any possible retrial to "disputed fact issues not covered by the trial court in its findings and conclusions," the Court of Appeal plainly indicated that the Fifth Amendment "taking" issue had been finally resolved. This is perfectly consistent, then, with the Court of Appeal's holding that there is no Fifth Amendment "taking" when excessive use of the police power is proved. Therefore, the Court's belief that the "disputed factual issues" involve appellant's failure to apply for a permit *ante,* at 631, n. 11, is beside the point, since under no set of factual circumstances may the court find a Fifth Amendment "taking."

[8] The Court of Appeal's first opinion unequivocally affirmed the Superior Court's finding of a "taking" on the facts of this case. App. 49–50, 60. It is no doubt true that the first opinion was deprived of all legal effect under California law once the California Supreme Court granted the city's petition for a hearing. *Knouse* v. *Nimocks,* 8 Cal. 2d 482, 483–484, 66 P. 2d 438, 438 (1937). Nevertheless, under this Court's view that the second Court of Appeal's opinion left open the "taking" question, this Court must admit, as it does, that the second opinion is inconsistent with the finding of a "taking" in the first. *Ante,* at 631, n. 11. Under my reading, the second is easily reconcilable with the first: because the Court of Appeal was obligated by the terms of the California Supreme Court's transfer order to hold that no regulatory action could effect a "taking," it was forced in its second opinion to abandon its original agreement with the Superior Court's finding of a "taking."

App. 42–43 (emphasis added). The Court of Appeal reversed this holding and concluded as a matter of law that no Fifth Amendment "taking" had occurred. This is indistinguishable, then, from a dismissal of appellant's case for legal insufficiency. In any such dismissal, factual questions are necessarily left unresolved. But when a litigant is denied relief as a matter of law, the judgment is necessarily final within the meaning of § 1257. See, *e. g., Allenberg Cotton Co.* v. *Pittman,* 419 U. S. 20, 24–25 (1974); *Windward Shipping* v. *American Radio Assn.,* 415 U. S. 104, 108 (1974).[9]

---

[9] In his concurring opinion, my Brother REHNQUIST, who dissented in *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469 (1975), writes:

"I am not sure under how many of the four exceptions of *Cox* JUSTICE BRENNAN may view this case as falling, but it seems to me that this case illustrates the problems which arise from a less than literal reading of the language 'final judgment or decree.'" *Ante,* at 635–636.

Then, he assumes that I agree with the Court that further proceedings will occur on remand to the Superior Court, and concludes that this appeal is therefore not final within the literal language of 28 U. S. C. § 1257, even if it may be treated as final under *Cox. Ante,* at 636.

With all respect, my Brother REHNQUIST misreads my position. I view the judgment as final within the literal meaning of § 1257, and therefore do not find it necessary to rely on any "exception" to the finality rule. Appellant alleged and proved a "taking" of its property without just compensation under the Just Compensation Clause of the Fifth Amendment. On review, the California Court of Appeal reversed, holding as a matter of federal law that there was no "taking." Since that time, appellant has continued to press its federal just compensation claim in a petition for rehearing before the Court of Appeal, a petition for hearing before the California Supreme Court, and an appeal to this Court. The Court of Appeal did not direct further proceedings in the Superior Court on appellant's claim. What the Court of Appeal indicated was that appellant was not precluded from "elect[ing] to retry the case," App. 66, on an alternative constitutional theory not based on the Just Compensation Clause. In other words, the Court of Appeal refused to recognize an alleged and proved constitutional violation and proposed that appellant try another and different constitutional theory. But obviously the judgment is final as to the rejected constitutional theory under even the strictest reading of § 1257. I can see no possible reason for refusing to

Since the Court of Appeal held that no Fifth Amendment "taking" had occurred, no just compensation was required. This is a classic final judgment. See *North Dakota Pharmacy Bd.* v. *Snyder's Drug Stores, Inc.*, 414 U. S. 156, 163 (1973); *Grays Harbor Logging Co.* v. *Coats-Fordney Logging Co.*, 243 U. S. 251, 256 (1917). I therefore dissent from the dismissal of this appeal, and address the merits of the question presented.[10]

### III

The Just Compensation Clause of the Fifth Amendment, made applicable to the States through the Fourteenth Amendment, *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U. S. 155, 160 (1980); see *Chicago, B. & Q. R. Co.* v. *Chicago*, 166 U. S. 226, 239, 241 (1897), states in clear and unequivocal terms: "[N]or shall private property be taken for public use, without just compensation." The question presented on the merits in this case is whether a government entity must pay just compensation when a police power regulation has effected a "taking" of "private property" for "public use" within the meaning of that constitutional provision.[11] Implicit in this question is the corollary issue

---

decide appellant's claim solely on the basis that the Court of Appeal proposed its own constitutional theory and strategy for retrying the case.

In sum, the accurate statement of my view is that appellant has received a final judgment. That judgment is "subject to no further review or correction in any other state tribunal; it [is] final as an effective determination of the litigation and not of merely interlocutory or intermediate steps therein. It [is] the final word of a final court." *Market Street R. Co.* v. *Railroad Comm'n*, 324 U. S. 548, 551 (1945).

[10] Appellees also argue that we may not exercise our appellate jurisdiction under 28 U. S. C. § 1257 (2) because appellant has not drawn in question the validity of a statute. Brief for Appellees 1–3. Even if I were to agree with appellees' contentions, I would treat the jurisdictional statement as a petition for writ of certiorari, and grant the petition. 28 U. S. C. §§ 1257 (3), 2103.

[11] This Court failed to reach this question in last Term's *Agins* v. *City of Tiburon*. In that case, as an alternative holding, the California

whether a government entity's exercise of its regulatory police power can ever effect a "taking" within the meaning of the Just Compensation Clause.[12]

## A

As explained in Part II, *supra,* the California courts have held that a city's exercise of its police power, however arbitrary or excessive, cannot as a matter of federal constitutional law constitute a "taking" within the meaning of the Fifth Amendment. This holding flatly contradicts clear precedents of this Court. For example, in last Term's *Agins* v. *City of Tiburon,* 447 U. S. 255, 260 (1980), the Court noted that "[t]he application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests . . . or [if it] denies an owner economically viable use of his land . . . ."[13] Applying that principle, the Court examined whether the Tiburon zon-

---

Supreme Court had found on the facts of the case that the Tiburon ordinance "did not unconstitutionally interfere with plaintiffs' entire use of the land or impermissibly decrease its value." 24 Cal. 3d, at 277, 598 P. 2d, at 31. This Court affirmed on that ground, thereby not reaching the broader ground that constitutes the sole basis for the opinion of the Court of Appeal in the instant case. 447 U. S., at 262–263.

[12] The question presented in appellant's jurisdictional statement states in pertinent part:

"Can a state court with impunity deny an aggrieved property owner its constitutionally mandated remedy of just compensation when a local government entity has (a) imposed arbitrary, excessive, and unconstitutional land use regulations; (b) commenced, but later abandoned direct acquisitive efforts under its power of eminent domain when its public purpose was satisfied by the restraints of the purported regulations; and (c) through a continuing course of conduct acted so as to deprive the property owner of all practical, beneficial or economic use of its property; and the property owner has so established as a matter of fact after full trial of the issues?" Juris. Statement 4–5.

[13] The Court of Appeal below rendered its decision almost one year before this Court's decision in *Agins* v. *City of Tiburon, supra.*

ing ordinance effected a "taking" of the Agins' property, concluding that it did not have such an effect. *Id.*, at 262–263.

In *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104 (1978), the Court analyzed "whether the restrictions imposed by New York City's [Landmarks Preservation] law upon appellants' exploitation of the [Grand Central] Terminal site effect a 'taking' of appellants' property . . . within the meaning of the Fifth Amendment." *Id.*, at 122. Canvassing the appropriate inquiries necessary to determine whether a particular restriction effected a "taking," the Court identified the "economic impact of the regulation on the claimant" and the "character of the governmental action" as particularly relevant considerations. *Id.*, at 124; see *id.*, at 130–131. Although the Court ultimately concluded that application of New York's Landmarks Law did not effect a "taking" of the railroad property, it did so only after deciding that "[t]he restrictions imposed are substantially related to the promotion of the general welfare and not only permit reasonable beneficial use of the landmark site but also afford appellants opportunities further to enhance not only the Terminal site proper but also other properties." *Id.*, at 138 (footnote omitted).

The constitutionality of a local ordinance regulating dredging and pit excavating on a property was addressed in *Goldblatt* v. *Town of Hempstead*, 369 U. S. 590 (1962). After observing that an otherwise valid zoning ordinance that deprives the owner of the most beneficial use of his property would not be unconstitutional, *id.*, at 592, the Court cautioned: "That is not to say, however, that governmental action in the form of regulation cannot be so onerous as to constitute a taking which constitutionally requires compensation," *id.*, at 594. On many other occasions, the Court has recognized in passing the vitality of the general principle that a regulation can effect a Fifth Amendment "taking." See, *e. g., PruneYard Shopping Center* v. *Robins*, 447 U. S. 74, 83 (1980); *Kaiser Aetna* v. *United States,* 444 U. S. 164,

174 (1979); *Andrus* v. *Allard,* 444 U. S. 51, 65–66 (1979); *United States* v. *Central Eureka Mining Co.,* 357 U. S. 155, 168 (1958).

The principle applied in all these cases has its source in Justice Holmes' opinion for the Court in *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 415 (1922), in which he stated: "The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." [14] The determination of a "taking" is "a question of degree—and therefore cannot be disposed of by general propositions." *Id.,* at 416.[15] While ac-

---

[14] One interpretation of the *Pennsylvania Coal* opinion insists that the word "taking" was used "metaphorically," and that the "gravamen of the constitutional challenge to the regulatory measure was that it was an invalid exercise of the police power under the due process clause, and the [case was] decided under that rubric." *Fred F. French Investing Co.* v. *City of New York,* 39 N. Y. 2d, at 594, 350 N. E. 2d, at 385; see also Brief for Appellees 37–38. In addition to tampering with the express language of the opinion, this view ignores the coal company's repeated claim before the Court that the Pennsylvania statute took its property without just compensation. Brief for Pennsylvania Coal Company, at 7–8, 16, 19–20, 21, 24, 28–33; Brief for the Mahons, at 73.

[15] More recent Supreme Court cases have emphasized this aspect of "taking" analysis, commenting that the Court has been unable to develop any "set formula to determine where regulation ends and taking begins," *Goldblatt* v. *Town of Hempstead,* 369 U. S. 590, 594 (1962), and that "[it] calls as much for the exercise of judgment as for the application of logic," *Andrus* v. *Allard,* 444 U. S. 51, 65 (1979). See *Penn Central Transp. Co.* v. *New York City,* 438 U. S., at 124 ("ad hoc, factual inquiries"); *United States* v. *Central Eureka Mining Co.,* 357 U. S. 155, 168 (1958) ("question properly turning upon the particular circumstances of each case").

One distinguished commentator has characterized the attempt to differentiate "regulation" from "taking" as "the most haunting jurisprudential problem in the field of contemporary land-use law . . . one that may be the lawyer's equivalent of the physicist's hunt for the quark." C. Haar, Land-Use Planning 766 (3d ed. 1976). See generally *id.,* at 766–777; Berger, A Policy Analysis of the Taking Problem, 49 N. Y. U. L. Rev. 165 (1974); Michelman, Property, Utility, and Fairness: Comments on

knowledging that "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law," *id.*, at 413, the Court rejected the proposition that police power restrictions could never be recognized as a Fifth Amendment "taking." [16] Indeed, the Court concluded that the Pennsylvania statute forbidding the mining of coal that would cause the subsidence of any house effected a "taking." *Id.*, at 414–416.[17]

---

the Ethical Foundations of "Just Compensation" Law, 80 Harv. L. Rev. 1165 (1967); Sax, Takings and the Police Power, 74 Yale L. J. 36 (1964). Another has described a 30-year series of Court opinions resulting from this case-by-case approach as a "crazy-quilt pattern." Dunham, Griggs v. Allegheny County in Perspective: Thirty Years of Supreme Court Expropriation Law, 1962 S. Ct. Rev. 63.

[16] Justice Brandeis, in dissent, argued the absolute position that a "restriction imposed to protect the public health, safety or morals from dangers threatened is not a taking." 260 U. S., at 417. In partial reliance on Justice Brandeis' dissent, one report urges that the Court overrule the *Pennsylvania Coal* case and hold that "a regulation of the use of land, if reasonably related to a valid public purpose, can never constitute a taking." F. Bosselman, D. Callies, & J. Banta, The Taking Issue 238–255 (1973).

[17] The California Supreme Court, in its opinion in *Agins* v. *City of Tiburon*, 24 Cal. 3d, at 274, 598 P. 2d, at 29, interpreted Justice Holmes' use of the word "taking" to "indicate the *limit* by which the acknowledged social goal of land control could be achieved by regulation rather than by eminent domain." (Emphasis added.) I find such a reading unpersuasive. The Court specifically indicated that a "regulation [that] goes too far . . . *will be recognized as a taking*," and that this determination is *"a question of degree."* *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S., at 415–416 (emphasis added). Clearly, then, the Court contemplated that a regulation could cross the boundary surrounding valid police power exercise and become a Fifth Amendment "taking."

The California court further argued that the Court in *Pennsylvania Coal* "did not attempt . . . to transmute the illegal governmental infringement into an exercise of eminent domain and the possibility of compensation was not even considered." *Agins* v. *City of Tiburon, supra,* at 274, 598 P. 2d, at 29. This overlooks the factual posture in *Penn-*

## B

Not only does the holding of the California Court of Appeal contradict precedents of this Court, but it also fails to recognize the essential similarity of regulatory "takings" and other "takings." The typical "taking" occurs when a government entity formally condemns a landowner's property and obtains the fee simple pursuant to its sovereign power of eminent domain. See, *e. g., Berman* v. *Parker,* 348 U. S. 26, 33 (1954). However, a "taking" may also occur without a formal condemnation proceeding or transfer of fee simple. This Court long ago recognized that

> "[i]t would be a very curious and unsatisfactory result, if in construing [the Just Compensation Clause] . . . it shall be held that if the government refrains from the absolute conversion of real property to the uses of the public it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can, in effect, subject it to total destruction without making any compensation, because, in the narrowest sense of that word, it is not *taken* for the public use." *Pumpelly* v. *Green Bay Co.,* 13 Wall. 166, 177–178 (1872) (emphasis in original).

See *Chicago, R. I. & P. R. Co.* v. *United States,* 284 U. S. 80, 96 (1931).

In service of this principle, the Court frequently has found "takings" outside the context of formal condemnation pro-

---

*sylvania Coal,* where the *homeowner,* not the *coal company,* brought an *injunction* action to prevent the company "from mining under their property in such a way as to remove the supports and cause a subsidence of the surface and of their house." *Pennsylvania Coal Co.* v. *Mahon, supra,* at 412. Because no one asked for an award of just compensation, there was no reason for the Court to consider it. The company only sought reversal of the Pennsylvania Supreme Court's decree that enjoined it from mining coal, and this Court granted that request.

ceedings or transfer of fee simple, in cases where government action benefiting the public resulted in destruction of the use and enjoyment of private property. *E. g., Kaiser Aetna* v. *United States,* 444 U. S., at 178–180 (navigational servitude allowing public right of access); *United States* v. *Dickinson,* 331 U. S. 745, 750–751 (1947) (property flooded because of Government dam project); *United States* v. *Causby,* 328 U. S. 256, 261–262 (1946) (frequent low altitude flights of Army and Navy aircraft over property); *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S., at 414–416 (state regulation forbidding mining of coal).

Police power regulations such as zoning ordinances and other land-use restrictions can destroy the use and enjoyment of property in order to promote the public good just as effectively as formal condemnation or physical invasion of property.[18] From the property owner's point of view, it may matter little whether his land is condemned or flooded, or whether it is restricted by regulation to use in its natural state, if the effect in both cases is to deprive him of all beneficial use of it. From the government's point of view, the benefits flowing to the public from preservation of open space through regulation may be equally great as from creating a wildlife refuge through formal condemnation or increasing electricity production through a dam project that floods private property. Appellees implicitly posit the distinction that the government *intends* to take property through condemnation or physical invasion whereas it does not through police power regulations. See Brief for Appellees 43. But "the

---

[18] In the instant case, for example, appellant contended that the city's actions "denied in all practical effect any possible beneficial or economical use of the subject property." Complaint ¶ 15, App. 11. Although the Court of Appeal's first opinion has no legal effect, see n. 8, *supra,* the court did observe that the city's objective was "to have the property remain unused, undisturbed and in its natural state so open space and scenic vistas may be preserved. In this sense the property is being 'used' by the public. . . ." App. 60.

Constitution measures a taking of property not by what a State says, or by what it intends, but by what it *does.*" *Hughes* v. *Washington,* 389 U. S. 290, 298 (1967) (STEWART, J., concurring) (emphasis in original); see *Davis* v. *Newton Coal Co.,* 267 U. S. 292, 301 (1925). It is only logical, then, that government action other than acquisition of title, occupancy, or physical invasion can be a "taking," and therefore a *de facto* exercise of the power of eminent domain, where the effects completely deprive the owner of all or most of his interest in the property. *United States* v. *Dickinson, supra,* at 748; *United States* v. *General Motors Corp.,* 323 U. S. 373, 378 (1945).

## IV

Having determined that property may be "taken for public use" by police power regulation within the meaning of the Just Compensation Clause of the Fifth Amendment, the question remains whether a government entity may constitutionally deny payment of just compensation to the property owner and limit his remedy to mere invalidation of the regulation instead. Appellant argues that it is entitled to the full fair market value of the property. Appellees argue that invalidation of the regulation is sufficient without payment of monetary compensation. In my view, once a court establishes that there was a regulatory "taking," the Constitution demands that the government entity pay just compensation for the period commencing on the date the regulation first effected the "taking," and ending on the date the government entity chooses to rescind or otherwise amend [19] the regulation.[20] This interpretation, I believe, is supported

---

[19] Under this rule, a government entity is entitled to amend the offending regulation so that it no longer effects a "taking." It may also choose formally to condemn the property.

[20] *Amicus* suggests that the California Supreme Court has not conclusively decided the issue whether interim damages might be awarded to compensate a landowner for economic loss sustained prior to invalidation of the zoning ordinance. Brief for United States as *Amicus Curiae*

654

by the express words and purpose of the Just Compensation Clause, as well as by cases of this Court construing it.

The language of the Fifth Amendment prohibits the "tak[ing]" of private property for "public use" without payment of "just compensation." As soon as private property has been taken, whether through formal condemnation proceedings, occupancy, physical invasion, or regulation, the landowner has *already* suffered a constitutional violation, and " 'the self-executing character of the constitutional provision with respect to compensation,' " *United States* v. *Clarke,* 445 U. S. 253, 257 (1980), quoting 6 J. Sackman, Nichols' Law of Eminent Domain § 25.41 (rev. 3d ed. 1980), is triggered. This Court has consistently recognized that the just compensation requirement in the Fifth Amendment is not precatory: once there is a "taking," compensation *must* be awarded. In *Jacobs* v. *United States,* 290 U. S. 13 (1933), for example, a Government dam project creating intermittent overflows onto petitioners' property resulted in the "taking" of a servitude. Petitioners brought suit against the Government to recover just compensation for the partial "taking." Commenting on the nature of the landowners' action, the Court observed:

"The suits were based on the right to recover just compensation for property taken by the United States for public use in the exercise of its power of eminent domain. That right was guaranteed by the Constitution. The fact that condemnation proceedings were not instituted and that the right was asserted in suits by the owners did not change the essential nature of the claim. The form of the remedy did not qualify the right. It rested upon the Fifth Amendment. Statutory recognition was not necessary. A promise to pay was not necessary.

23, and n. 24. But since the California courts fail to concede that a regulation can effect a "taking," any award of interim damages would not be justified or determined, as constitutionally required, under the Just Compensation Clause.

Such a promise was implied because of the duty to pay imposed by the Amendment." *Id.*, at 16.

See also *Griggs* v. *Allegheny County*, 369 U. S. 84, 84–85, 88–90 (1962); *United States* v. *Causby*, 328 U. S., at 268.[21] Invalidation unaccompanied by payment of damages would hardly compensate the landowner for any economic loss suffered during the time his property was taken.[22]

---

[21] *Amici* suggest that the Court's awards of just compensation in cases involving the United States were premised either on a "theory of implied promise to pay . . . or [on] congressional authorization [to pay] under the Tucker Act, 28 U. S. C. 1346 (a)." Brief for United States as *Amicus Curiae* 27; see Brief for the National Trust for Historic Preservation et al. as *Amici Curiae* 7–8. This suggestion mischaracterizes the import of our cases. As the Court has noted:

"But whether the theory . . . be that there was a taking under the Fifth Amendment, and that therefore the Tucker Act may be invoked because it is a claim founded upon the Constitution, or that there was an implied promise by the Government to pay for it, is immaterial. In either event, the claim traces back to the prohibition of the Fifth Amendment, 'nor shall private property be taken for public use, without just compensation.' The Constitution is 'intended to preserve practical and substantial rights, not to maintain theories.'" *United States* v. *Dickinson*, 331 U. S. 745, 748 (1947).

[22] The instant litigation is a good case in point. The trial court, on April 9, 1976, found that the city's actions effected a "taking" of appellant's property on June 19, 1973. If true, then appellant has been deprived of all beneficial use of its property in violation of the Just Compensation Clause for the past seven years.

Invalidation hardly prevents enactment of subsequent unconstitutional regulations by the government entity. At the 1974 annual conference of the National Institute of Municipal Law Officers in California, a California City Attorney gave fellow City Attorneys the following advice:

"*IF ALL ELSE FAILS, MERELY AMEND THE REGULATION AND START OVER AGAIN.*

"If legal preventive maintenance does not work, and you still receive a claim attacking the land use regulation, or if you try the case and lose, don't worry about it. All is not lost. One of the extra 'goodies' contained in the recent [California] Supreme Court case of *Selby* v. *City of San Buenaventura*, 10 C. 3d 110, appears to allow the City to change the

Moreover, mere invalidation would fall far short of fulfilling the fundamental purpose of the Just Compensation Clause. That guarantee was designed to bar the government from forcing some individuals to bear burdens which, in all fairness, should be borne by the public as a whole. *Armstrong* v. *United States*, 364 U. S. 40, 49 (1960). See *Agins* v. *City of Tiburon*, 447 U. S., at 260; *Andrus* v. *Allard*, 444 U. S., at 65. When one person is asked to assume more than a fair share of the public burden, the payment of just compensation operates to redistribute that economic cost from the individual to the public at large. See *United States* v. *Willow River Co.*, 324 U. S. 499, 502 (1945); *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 325 (1893). Because police power regulations must be substantially related to the advancement of the public health, safety, morals, or general welfare, see *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 395 (1926), it is axiomatic that the public receives a benefit while the offending regulation is in effect.[23] If the regulation denies the private property owner the use and enjoyment of his land and is found to effect a "taking," it is only fair that the public bear the cost of benefits received during the interim period between application of the

---

regulation in question, even after trial and judgment, make it more reasonable, more restrictive, or whatever, and everybody starts over again.

.      .      .      .      .

"See how easy it is to be a City Attorney. Sometimes you can lose the battle and still win the war. Good luck." Longtin, Avoiding and Defending Constitutional Attacks on Land Use Regulations (Including Inverse Condemnation), in 38B NIMLO Municipal Law Review 192–193 (1975) (emphasis in original).

[23] A different case may arise where a police power regulation is not enacted in furtherance of the public health, safety, morals, or general welfare so that there may be no "public use." Although the government entity may not be forced to pay just compensation under the Fifth Amendment, the landowner may nevertheless have a damages cause of action under 42 U. S. C. § 1983 for a Fourteenth Amendment due process violation.

regulation and the government entity's rescission of it. The payment of just compensation serves to place the landowner in the same position monetarily as he would have occupied if his property had not been taken. *Almota Farmers Elevator & Warehouse Co.* v. *United States,* 409 U. S. 470, 473–474 (1973); *United States* v. *Reynolds,* 397 U. S. 14, 16 (1970).

The fact that a regulatory "taking" may be temporary, by virtue of the government's power to rescind or amend the regulation, does not make it any less of a constitutional "taking." Nothing in the Just Compensation Clause suggests that "takings" must be permanent and irrevocable. Nor does the temporary reversible quality of a regulatory "taking" render compensation for the time of the "taking" any less obligatory. This Court more than once has recognized that temporary reversible "takings" should be analyzed according to the same constitutional framework applied to permanent irreversible "takings." For example, in *United States* v. *Causby, supra,* at 258–259, the United States had executed a lease to use an airport for a one-year term "ending June 30, 1942, with a provision for renewals until June 30, 1967, or six months after the end of the national emergency, whichever [was] the earlier." The Court held that the frequent low-level flights of Army and Navy airplanes over respondents' chicken farm, located near the airport, effected a "taking" of an easement on respondents' property. 328 U. S., at 266–267. However, because the flights could be discontinued by the Government at any time, the Court remanded the case to the Court of Claims: "Since on this record *it is not clear whether the easement taken is a permanent or a temporary one,* it would be premature for us to consider whether the amount of the award made by the Court of Claims was proper." *Id.,* at 268 (emphasis added). In other cases where the Government has taken only temporary use of a building, land, or equipment, the Court has not hesitated to determine the appropriate measure of just compensation. See *Kimball Laundry Co.* v. *United States,* 338

U. S. 1, 6 (1949); *United States* v. *Petty Motor Co.*, 327 U. S. 372, 374–375 (1946); *United States* v. *General Motors Corp.*, 323 U. S., at 374–375.

But contrary to appellant's claim that San Diego must formally condemn its property and pay full fair market value, nothing in the Just Compensation Clause empowers a court to order a government entity to condemn the property and pay its full fair market value, where the "taking" already effected is temporary and reversible and the government wants to halt the "taking." Just as the government may cancel condemnation proceedings before passage of title, see 6 J. Sackman, Nichols' Law of Eminent Domain § 24.113, p. 24–21 (rev. 3d ed. 1980), or abandon property it has temporarily occupied or invaded, see *United States* v. *Dow,* 357 U. S. 17, 26 (1958), it must have the same power to rescind a regulatory "taking." As the Court has noted: "[A]n abandonment does not prejudice the property owner. It merely results in an alteration of the property interest taken—from full ownership to one of temporary use and occupation. . . . In such cases compensation would be measured by the principles normally governing the taking of a right to use property temporarily." *Ibid.;* see *Danforth* v. *United States,* 308 U. S. 271, 284 (1939).

The constitutional rule I propose requires that, once a court finds that a police power regulation has effected a "taking," the government entity must pay just compensation for the period commencing on the date the regulation first effected the "taking," and ending on the date the government entity chooses to rescind or otherwise amend the regulation.[24] Ordinary principles determining the proper measure of just compensation, regularly applied in cases of permanent and

---

[24] Contrary to the suggestion of *amici,* see, *e. g.,* Brief for the National Trust for Historic Preservation et al. as *Amici Curiae* 13–16, this is not a case involving implication of a damages remedy—the words of the Just Compensation Clause are express.

temporary "takings" involving formal condemnation proceedings, occupations, and physical invasions, should provide guidance to the courts in the award of compensation for a regulatory "taking." As a starting point, the value of the property taken may be ascertained as of the date of the "taking." *United States* v. *Clarke,* 445 U. S., at 258; *Almota Farmers Elevator & Warehouse Co.* v. *United States, supra,* at 474; *United States* v. *Miller,* 317 U. S. 369, 374 (1943); *Olson* v. *United States,* 292 U. S. 246, 255 (1934). The government must inform the court of its intentions vis-à-vis the regulation with sufficient clarity to guarantee a correct assessment of the just compensation award. Should the government decide immediately to revoke or otherwise amend the regulation, it would be liable for payment of compensation only for the interim during which the regulation effected a "taking."[25] Rules of valuation already developed for temporary "takings" may be particularly useful to the courts in their quest for assessing the proper measure of monetary relief in cases of revocation or amendment, see generally *Kimball Laundry Co.* v. *United States, supra; United States* v. *Petty Motor Co., supra; United States* v. *General Motors Corp., supra,* although additional rules may need to be developed, see *Kimball Laundry Co.* v. *United States, supra,* at 21–22 (Rutledge, J., concurring); *United States* v. *Miller, supra,* at 373–374. Alternatively the government may choose

---

[25] See generally D. Hagman & D. Misczynski, Windfalls for Wipeouts 296–297 (1978); Bosselman, The Third Alternative in Zoning Litigation, 17 Zoning Digest 113, 114–119 (1965). The general notion of compensating landowners for regulations which go too far has received much attention in land-use planning literature. See, *e. g.,* Costonis, "Fair" Compensation and the Accommodation Power: Antidotes for the Taking Impasse in Land Use Controversies, 75 Colum. L. Rev. 1021 (1975); R. Babcock, The Zoning Game 168–172 (1966); Krasnowiecki & Paul, The Preservation of Open Space in Metropolitan Areas, 110 U. Pa. L. Rev. 179, 198–239 (1961). See also American Law Institute, A Model Land Development Code §§ 5–303, 5–304, pp. 202–207 (1975); Town and Country Planning Act, 1947, 10 & 11 Geo. 6, ch. 51, § 19.

formally to condemn the property, or otherwise to continue the offending regulation: in either case the action must be sustained by proper measures of just compensation. See generally *United States* v. *Fuller,* 409 U. S. 488, 490–492 (1973); *United States ex rel. TVA* v. *Powelson,* 319 U. S. 266, 281–285 (1943).

It should be noted that the Constitution does not embody any specific procedure or form of remedy that the States must adopt: "The Fifth Amendment expresses a principle of fairness and not a technical rule of procedure enshrining old or new niceties regarding 'causes of action'—when they are born, whether they proliferate, and when they die." *United States* v. *Dickinson,* 331 U. S., at 748. Cf. *United States* v. *Memphis Cotton Oil Co.,* 288 U. S. 62, 67–69 (1933). The States should be free to experiment in the implementation of this rule, provided that their chosen procedures and remedies comport with the fundamental constitutional command. See generally Hill, The Bill of Rights and the Supervisory Power, 69 Colum. L. Rev. 181, 191–193 (1969). The only constitutional requirement is that the landowner must be able meaningfully to challenge a regulation that allegedly effects a "taking," and recover just compensation if it does so. He may not be forced to resort to piecemeal litigation or otherwise unfair procedures in order to receive his due. See *United States* v. *Dickinson, supra,* at 749.

## V

In *Agins* v. *City of Tiburon,* 24 Cal. 3d, at 275, 598 P. 2d, at 29, the California Supreme Court was "persuaded by various policy considerations to the view that inverse condemnation is an inappropriate and undesirable remedy in cases in which unconstitutional regulation is alleged." In particular, the court cited "the need for preserving a degree of freedom in land-use planning function, and the inhibiting financial force which inheres in the inverse condemnation remedy," in reaching its conclusion. *Id.,* at 276, 598 P. 2d, at 31. But

the applicability of express constitutional guarantees is not a matter to be determined on the basis of policy judgments made by the legislative, executive, or judicial branches.[26] Nor can the vindication of those rights depend on the expense in doing so. See *Watson* v. *Memphis,* 373 U. S. 526, 537–538 (1963).

Because I believe that the Just Compensation Clause requires the constitutional rule outlined *supra,* I would vacate the judgment of the California Court of Appeal, Fourth District, and remand for further proceedings not inconsistent with this opinion.[27]

---

[26] Even if I were to concede a role for policy considerations, I am not so sure that they would militate against requiring payment of just compensation. Indeed, land-use planning commentators have suggested that the threat of financial liability for unconstitutional police power regulations would help to produce a more rational basis of decisionmaking that weighs the costs of restrictions against their benefits. Dunham, From Rural Enclosure to Re-Enclosure of Urban Land, 35 N. Y. U. L. Rev. 1238, 1253–1254 (1960). Such liability might also encourage municipalities to err on the constitutional side of police power regulations, and to develop internal rules and operating procedures to minimize overzealous regulatory attempts. Cf. *Owen* v. *City of Independence,* 445 U. S. 622, 651–652 (1980). After all, if a policeman must know the Constitution, then why not a planner? In any event, one may wonder as an empirical matter whether the threat of just compensation will greatly impede the efforts of planners. Cf. *id.,* at 656.

[27] Because the California Court of Appeal, Fourth District, followed the instructions of the California Supreme Court and held that the city's regulation, however arbitrary or excessive, could not effect a "taking," the Court of Appeal did not address the issue whether San Diego's course of conduct *in fact* effected a "taking" of appellant's property. I would not reach that issue here, but leave it open for the Court of Appeal on remand initially to decide that question on its review of the Superior Court's judgment.