**Jeron J. LAFARGUE, et al., on behalf of themselves and all others similarly situated**

v.

**The UNITED STATES of America and Louisiana Intrastate Gas Company.**

No. Civ.A. 97–2393.

United States District Court, E.D. Louisiana.

April 8, 1998.

582

Peter Stephen Title, Andrew A. Braun, Camilo Kossy Salas, III, Sessions & Fishman, New Orleans, LA, Gregg Lindsey Spyridon, Robert Joshua Koch, Jr., Edmund S. LaTour, Spyridon, Koch, Psarellis, Wallace & Palermo, Metairie, LA, for Plaintiffs.

David F. Shuey, U.S. Department of Justice, Washington, DC, Glenn Kenneth Schreiber, U.S. Attorney's Office, New Orleans, LA, Paul T. Michael, U.S. Department of Energy, Economic Regulatory Administration, Washington, DC, for United States of America, defendant.

James P. Dore, George William Jarman, J. Carter Wilkinson, Troy J. Charpentier, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, LLP, Baton Rouge, LA, Julie Parelman Silbert, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, LLP, New Orleans, LA, for Louisiana Intrastate Gas Company, L.L.C., defendant.

### ORDER AND REASONS DENYING DEFENDANTS' MOTIONS TO DISMISS

VANCE, District Judge.

This matter comes before the Court on motions to dismiss brought by defendants United States of America (the "Government") and Louisiana Intrastate Gas Company, L.L.C. ("LIG"). For the reasons set forth below, the motions are DENIED.

## I. BACKGROUND

This case revolves around the ownership of a pipeline and underlying servitudes located in the Louisiana Parishes of Iberia, St. Mary, St. Martin, St. James, and Assumption. In 1975, Congress enacted the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. § 6201, *et seq.*, pursuant to which the government established the Strategic Petroleum Reserve Program ("SPRP"). The SPRP was intended to serve as a reserve to reduce the impact of energy supply interruptions or reductions in imports of crude oil and refined petroleum products. Under the EPCA, and to the extent necessary or appropriate to implement the SPRP, the government is authorized to "acquire by purchase, condemnation or otherwise, land or interests in land for the location of storage and related facilities." 42 U.S.C. § 6239(f)(5)(B). The government may also "construct, purchase, lease or otherwise acquire storage and related facilities," and "use, lease, maintain, sell, or otherwise dispose of storage and related facilities acquired pursuant to this part." 42 U.S.C. § 6239(f)(5)(C), (D). Further, the government is authorized to "execute any contracts necessary to carry out the provisions" of the SPRP. § 6239(f)(5)(G).

Pursuant to this statutory authority, the Government accepted donations of easements and servitudes from owners of land located in the Louisiana Parishes of Iberia, St. Martin, St. James, and Assumption. The named plaintiffs in this proposed class action were parties to the Donation of Servitude and Easement (hereinafter "the Donation"), attached as Exh. B. to the Decl. of Patricia C. Sigur.[1] The Donation states:

> The above named parties declare that we, by this act, do donate, convey, transfer, set over and deliver, without any warranty, liability, or recourse, but with full substitution and subrogation in and to all rights and action of warranty which said grantors have or may have against all preceding owners and vendors, unto the United

---

1. Plaintiffs note that while this specific Donation of Servitude and Easement pertains only to a small portion of the Pipeline, there are several

hundred other landowners who made similar donations, as well as other types of conveyances to the government. *See* Pls.' Mem., Exhs. A–N.

States of America, and its assigns, including its officers, agents, servants, and contractors, a perpetual and assignable easement and right-of-way in, on, over and across the land for the location, construction, operation, maintenance, alteration, repair, and patrol of a single pipeline in the establishment, management, and maintenance of the Strategic Petroleum Reserve....

Donation at 2. The Donation also specifies the ways in which the easement may terminate:

This donation is made and accepted for and in consideration of Grantors' desire to aid their country in the establishment of a Strategic Petroleum Reserve and in further consideration of Grantee's agreement to construct and operate said pipeline in accordance with the following specific requirements:

1. The rights herein donated to Grantee shall expire, terminate, and cease and this act shall be rendered null, void and unenforceable on December 31, 1981 if by such date Grantee shall have not commenced construction of the Strategic Petroleum Reserve pipeline.

2. The causes for termination of this easement shall include, but not be limited to, the following: (a) abandonment, (b) removal of the pipeline, (c) ten years non-use, or (d) execution of an affidavit by an authorized representative of the United States of America stating that the pipeline has been abandoned. Upon termination for any reason the United States of America shall have the election at its sole discretion of abandoning the pipeline and related improvements in place or removing it at its own expense. Such removal, if so elected, shall be completed within one year after termination. If abandonment in place is elected, Grantee shall have no claim against Grantors for compensation or damages, and the pipeline and related improvements shall become the property

of the Grantors without any payment to the Grantee.

Donation at 5.

In recent years, due to a geotechnical problem related to the underground storage facility at Weeks Island, the Government took steps to decommission both the Pipeline and the storage facility. The Government asserts that bids were solicited from interested parties for the sale of the Pipeline and the perpetual easements. After this suit was filed, the Government sold and conveyed to LIG, "as is" and "where is" under a quitclaim deed executed August 22, 1997 all title, right, and interest the Government had in the Pipeline and the perpetual easements for a total sum of $22,000,000. *See* Decl. of Ms. Sigur, Exh. A. LIG intends to integrate the Pipeline into its existing pipeline system, which is used for the transportation of natural gas.

Prior to the August 22, 1997 sale, LIG—"out of an abundance of caution"—attempted to enter into new conventional right-of-way and servitude agreements with the landowners along the length of the pipeline (hereinafter the "LIG Agreement"). The LIG Agreement states that the new servitude will be subject to the Donation and that the Donation will terminate when LIG begins operations of the existing Pipeline as a natural gas pipeline or when the Government transfers all of its rights in the Donation, whichever comes first. *See* Compl., Exh. B. LIG contends that 95% of the landowners along the length of the pipeline have entered into such agreements. LIG's Answer ¶ 1A.

Plaintiffs initiated this class action on July 31, 1997 and filed a first amended complaint on October 24, 1997. Plaintiffs' proposed class is defined as all those persons and entities who granted servitudes and easements in favor of the Government for the location, construction, operation, maintenance, alteration, repair, and patrol of the Pipeline. Compl. ¶ 8. The plaintiffs also propose two subclasses: (1) All those persons and entities who fall into the proposed class and who executed the LIG Agreement, or similar documents; (2) All those persons and entities who fall into the proposed class and who *did not* execute the LIG Agreement, or similar documents. Compl. ¶ 9.

Count I of plaintiffs' complaint states that all of the servitudes granted to the Government have expired and/or terminated, and that plaintiffs are entitled to a decree by this Court declaring that the members of the proposed class are the full owners of the Pipeline and related improvements located upon their respective properties. Compl. ¶ 45. The plaintiffs allege that the servitudes have expired and/or terminated because:

(a) the Government, through its own actions, has permanently discontinued the use of the Servitudes for the purpose for which they were granted, *i.e.*, in connection with the Strategic Petroleum Reserve, and has transferred, or is in the process of transferring its right under the Servitudes and to the Pipeline to a transferee engaged in the business of transporting natural gas, rendering it impossible for the Government to use the Servitudes for the purposes required thereby;

(b) the Servitudes were granted subject to the express or implied resolutory condition that the Pipeline be used solely in connection with the Strategic Petroleum Reserve Program and the resolutory condition has been fulfilled;

(c) the Government has decommissioned, or is in the process of decommissioning the Weeks Island Facility and the Pipeline; and/or

(d) the Government has renounced the Servitudes.

Compl. ¶ 42.

In Count II, if plaintiffs are found not to be the owners of the Pipeline and related improvements, they request that the Government and/or LIG remove the Pipeline at their expense. Compl. ¶ 47. Count III of the Complaint states that LIG and the Government should be permanently enjoined, restrained, and prohibited from using the Pipeline for any use or purpose other than that set forth in the servitude agreements, *i.e.*, for the establishment, management, and maintenance of the SPRP. Compl. ¶ 49.

Counts IV and V seek money damages from the Government and/or LIG in the amount of $22 million. The plaintiffs allege:

The actions of the Government in transferring or attempting to transfer the Pipeline and the rights or interests it claims to have under the Servitudes to LIGC constitute a taking of the property of Plaintiffs and the other Members of the proposed class without due process of law as required by the Fifth Amendment to the United States Constitution because the Servitudes have expired or are deemed to have terminated or extinguished and, as a result, the Plaintiffs and the members of the proposed class are the owners of the interests and rights which the Government has purported or intends to sell or assign to LIGC, not the Government.

Compl. ¶ 41. As a result of these actions, Count IV seeks a judgment against the Government for the full value of the property rights transferred to LIG, which is alleged to be an amount no less than $22 million. Compl. ¶ 51. Alternatively, Count V states that, as owners of the property rights transferred to LIG by the Government, the plaintiffs and proposed class members are entitled to a judgment in their favor solidarily against the Government and LIG for the consideration paid, or to be paid, by LIG for the transfer of such rights. Compl. ¶ 53.

In Count VI, plaintiffs allege that the Pipeline constitutes a corporeal immovable under Louisiana law and that all persons who entered into right-of-way agreements with LIG were paid less than one-half of the fair market value of such right, title, and interest in the Pipeline. Compl. ¶¶ 55–57. Further, plaintiffs allege that all such persons are entitled to a judgment against LIG rescinding the sale for lesion beyond moiety. Compl. ¶ 58.

Defendants now move this Court to dismiss plaintiffs' lawsuit based on lack of subject matter jurisdiction and improper venue. Defendants contend that jurisdiction in this federal court is improper because the Government has disclaimed any interest in the property, and plaintiffs' claims exceed the jurisdictional amount for an inverse condemnation proceeding in the district court. The

Government argues that venue does not lie in the Eastern District of Louisiana because none of the named plaintiffs' property is located in this district, and none of the subject landowners in this district could be joined as members of the proposed class. LIG also moves to transfer the case to the Western District of Louisiana, pursuant to 28 U.S.C. § 1404(a), arguing that the Western District is a more appropriate and convenient venue for the hearing of this matter. Further, LIG asserts that, if this Court finds that it has jurisdiction over plaintiffs' lawsuit, this Court should also exercise jurisdiction over LIG's claim for expropriation because there is supplemental jurisdiction, and it is a compulsory counterclaim under Federal Rule of Civil Procedure 13(a). The Government also contends that plaintiffs have failed to state a claim upon which relief may be granted.

## II. DISCUSSION

### A. Subject Matter Jurisdiction

An action must be dismissed if it appears that the Court does not possess subject matter jurisdiction over the plaintiffs' claims. Fed.R.Civ.P. 12(b)(1), (h)(3). As the party invoking jurisdiction, the plaintiffs carry the burden of establishing subject matter jurisdiction. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 1675, 128 L.Ed.2d 391 (1994). Unlike the district court's review of a Rule 12(b)(6) motion to dismiss, the Court may examine evidence outside of the pleadings when deciding a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. It is well established that the district court may base its decision on a Rule 12(b)(1) motion on " '(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; and (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.' " *Barrera–Montenegro v. United States*, 74 F.3d 657, 659

(5th Cir.1996) (*quoting Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir.1981)).

### 1. Nature of Plaintiffs' Complaint

In response to defendants' attack upon their jurisdictional pleadings, plaintiffs assert four theories of subject matter jurisdiction: (1) the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a, and its jurisdictional counterpart, 28 U.S.C. § 1346(f); (2) the Baby Tucker Act, 28 U.S.C. § 1346(a)(2); (3) 28 U.S.C. § 1331, federal question jurisdiction; and (4) supplemental jurisdiction under 28 U.S.C. § 1367, for their state claims. Before deciding whether jurisdiction is proper under any of these grounds, the Court must first determine whether plaintiffs have actually brought a case that fits within these statutory schemes.

The Quiet Title Act, 28 U.S.C. § 2409a ("QTA"), waives the United States' sovereign immunity and permits the United States to be named as a party defendant in a civil action "to adjudicate a disputed title to real property in which the United States claims an interest." 28 U.S.C. § 2409a(a). Section 1346(f), in turn, provides that the district courts shall have exclusive jurisdiction of civil actions initiated under the QTA to quiet title to an estate or interest in real property in which an interest is claimed by the United States. 28 U.S.C. § 1346(f). The Supreme Court has made clear that "Congress intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States' title to real property." *Block v. North Dakota*, 461 U.S. 273, 287, 103 S.Ct. 1811, 1819, 75 L.Ed.2d 840 (1983).

Prior to the passage of the QTA in 1972, the United States was protected by its sovereign immunity from suits involving title to land. Those willing to settle for monetary damages rather than title to the disputed land, however, could resort to the Tucker Act, 28 U.S.C. §§ 1346(a)(2) and 1491, and attempt to make out a claim for an unconstitutional taking of their property.[2] As the

**2.** Section 1346(a)(2) states that district courts shall have original jurisdiction, concurrent with the Court of Federal Claims, of civil actions or claims "against the United States, not exceeding $10,000 in amount, founded either upon the Constitution or any Act of Congress." 28 U.S.C.

1346(a)(2). This provision is the analogous district court provision to 28 U.S.C. § 1491(a)(1), which grants the Court of Federal Claims jurisdiction over similar claims without a monetary cap. Takings claims seeking damages for just

Supreme Court explained, "[r]ather than seeking a declaration that they owned the property at issue, such claimants would concede that the Government possessed title and then would seek compensation for the Government's having taken the property from them." *United States v. Mottaz*, 476 U.S. 834, 849, 106 S.Ct. 2224, 2233, 90 L.Ed.2d 841 (1986). Indeed, a recognition of this gap in remedies motivated the passage of the QTA. *See* H.R.Rep. No. 1559, 92d Cong., 2d Sess. (1972), *reprinted in* 1972 U.S.C.C.A.N. 4547, 4556 (hereinafter "House Report") ("The claimants only remedy is under the Tucker Act.... This provision allows a remedy of damages for a taking of real property, but disallows a return of the property to the claimant, and is thus obviously limited.").

■ Generally, a takings claim brought under § 1346(a)(2) is an inverse condemnation suit, and it is filed by the landowner after the government enters into physical possession of his property without the authority of a court order. *See San Diego Gas & Elec. Co. v. City of San Diego*, 450 U.S. 621, 638 n. 2, 101 S.Ct. 1287, 1297 n. 2, 67 L.Ed.2d 551 (1981) ("The phrase 'inverse condemnation' generally describes a cause of action against a government defendant in which a landowner may recover just compensation for a 'taking' of his property under the Fifth Amendment, even though formal condemnation proceedings in exercise of the sovereign's power of eminent domain have not been instituted by the government entity."); *United States v. Dow*, 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958) (explaining that United States may take property pursuant to its power of eminent domain either through condemnation proceedings or by taking physical possession of property without authority of a court order). Thus, a Tucker Act claim is typically instituted after the government has exercised its power of eminent domain, and the landowner seeks monetary damages for the government's actions.[3]

■ There is a clear distinction between a claim brought under the QTA and one based upon the Tucker Act: a takings claim under the Tucker Act concedes the government's ownership and seeks to obtain just compensation for the landowner, while a quiet title claim under the QTA disputes ownership and provides the landowner with a declaration of title and recovery of the land. Although plaintiffs in their briefs assert that the Court has jurisdiction under either of these statutory schemes, the Court must examine the nature of the rights plaintiffs assert in their complaint to determine which statute the plaintiffs' case falls under. *See Mottaz*, 476 U.S. at 850–51, 106 S.Ct. at 2233–34 (examining jurisdictional grounds of case involving disputed title and stating that " 'the plaintiff is absolute master of what jurisdiction he will appeal to,' " and that " '[j]urisdiction generally depends upon the case made and relief demanded by the plaintiff' ") (*quoting Healy v. Sea Gull Specialty Co.*, 237 U.S. 479, 480, 35 S.Ct. 658, 59 L.Ed. 1056 (1915) (Holmes, J.)); *Brewer v. United States*, 562 F.Supp. 128, 132 (E.D.Mo.1983) (examining whether plaintiff seeks to assert rights contained in QTA or Tucker Act).

After reviewing plaintiffs' complaint and its memoranda, this Court concludes that plaintiffs' suit is based on the QTA, and they have not pled an action under the Tucker Act. The Supreme Court in *Mottaz* indicated that in order to have a viable Tucker Act claim, the plaintiff must seek compensation for an already completed taking of land and not a declaration of present title. *Mottaz*, 476 U.S. at 850–51, 106 S.Ct. at 2234. In *Mottaz*, the Court concluded that plaintiff's case did not fall under the Tucker Act because she claimed that she still owned her interest in the property, and she sought to force the government to purchase her interests. *See id.* (explaining that plaintiff claimed "in essence, that no legally cognizable taking ha[d] yet occurred" and that her request for damages was not in payment for the government's past acts).[4]

compensation are properly brought under either of these statutory provisions.

**3.** "Eminent domain" is the power of the sovereign to take property for public use without the

owner's consent. *San Diego Gas*, 450 U.S. at 638 n. 2, 101 S.Ct. at 1297 n. 2.

**4.** The Court concluded that because the claim was not based on the Tucker Act, her appeal to the Court of Appeals for the Eighth Circuit, rath-

The court in *Brewer v. United States*, 562 F.Supp. 128, 132 (E.D.Mo.1983), made a similar inquiry and determined that plaintiff's complaint asserted rights under the QTA and not under the Tucker Act. In that case, the court found that several factors militated against plaintiff's claims being grounded in the Tucker Act. First, plaintiff sought a declaration of her rightful title to the disputed property. Second, plaintiff requested monetary damages for an amount greater than $10,000, bringing the claim outside of the jurisdiction of the district court under § 1346(a)(2). Finally, the court noted that the government took possession of the disputed land pursuant to a deed "and not in a purposeful effort to effectuate a condemnation under the Tucker Act." *Id.* at 132. The court therefore treated plaintiff's complaint as asserting rights under the QTA. As a result, the court dismissed plaintiff's claim for monetary damages because "[t]here is no provision in 28 U.S.C. § 2409a for the award of monetary relief for unwarranted possession." *Id.*

■ In this case, based on the case made, relief demanded, and the rights asserted by the plaintiffs, the Court finds that plaintiffs' case falls under the QTA, but not under the Tucker Act. In their complaint, plaintiffs specifically invoke this Court's jurisdiction under the QTA—no mention is made of § 1346(a)(2). They ask to be declared the owners of the property in issue and in essence challenge the Government's right to transfer the property to LIG on the theory that the Government does not own the property. *See* Compl., Counts I, V, ¶ 41. Further, the complaint asserts that:

> Plaintiffs ... bring this suit seeking a determination (1) that as a result of the nonuse of the pipeline and the decommissioning of the Weeks Island Facility, the servitudes granted to the Government have been terminated, extinguished or abandoned, (2) that the Government has no further servitude rights or other interests o or to the property owned by Plaintiffs and the members of the proposed class o the pipeline which it can assign o convey to third parties, and (3) if the Government desires to retain a servitude through the lands owned by Plaintiffs and the members of the proposed class and an interest in the pipeline, or if the Government wishes to assign its interests therein to a third party, then the Government must first pay just compensation therefor to the Plaintiffs and the class members.

Compl. ¶ 5. Clearly, the plaintiffs seek to be declared the owners of the servitudes and the Pipeline. Further, the monetary relief requested in the quoted paragraph does not implicate the Tucker Act. Rather, it implicitly refers to 28 U.S.C. § 2409a(b) of the QTA, which permits the United States to choose between purchasing the right of possession and ceasing to occupy the land, if the "final determination" regarding title is adverse to the United States.[5]

■ The Court also finds that plaintiffs have not alternatively pled a takings claim under § 1346(a)(2). The complaint fails to allege the monetary amount of each class member's claim, an amount that must be less than $10,000 to fall under the district court's jurisdiction. Moreover, as previously noted, the claim for monetary relief calls upon a provision in the QTA, not the Baby Tucker Act. Finally, the only hint of an alternative claim is in Count II in which the plaintiffs seek the removal of the Pipeline—a remedy that is unavailable from either the QTA or the Tucker Act. In short, the Court con-

---

er than to the Federal Circuit, was proper. *Mottaz*, 476 U.S. at 851, 106 S.Ct. at 2234.

**5.** Section 2409a(b) reads in pertinent part: "[I]f the final determination shall be adverse to the United States, the United States nevertheless may retain possession or control of the real property or any part thereof as it may elect, upon payment to the person determined to be entitled thereto of an amount which upon such election the district court in the same action shall determine to be just compensation for such possession or control." 28 U.S.C. § 2409a(b). As the legislative history indicates, this procedure "preserves the Tucker Act method for acquisition of property by the Government, as it preserves the concomitant right of the former owner to receive just compensation. A difference from the remedy provided by 28 U.S.C. § 1346(a)(2), however, is that the district courts would have jurisdiction without regard to any jurisdictional amount." House Report at 4555.

cludes that plaintiffs fail to assert a takings claim under § 1346(a)(2).

Although plaintiffs' claims fall under the QTA, plaintiffs seek a wider range of relief than is available under the QTA. Count I seeks a declaration of ownership to the servitude and the Pipeline. This remedy is exactly what the QTA was meant to provide. Alternatively, if plaintiffs are found not to be the owners, Count II asks that the Government and/or LIG remove the Pipeline. As noted above, neither the QTA nor the Tucker Act provides for such relief. Count III requests a permanent injunction, limiting LIG's use of the Pipeline to the purposes stated in the Donation. Injunctive relief is also not available under the QTA or the Tucker Act. Count IV seeks monetary damages against the Government, as a result of its actions, for the full value of the property rights transferred to LIG, and Count V asks for monetary relief against the Government and LIG, as owners of the property rights that were transferred to LIG by the Government. Similar to the request for compensation in ¶ 5(3) of the complaint, these counts ask for compensation as a result of the plaintiffs' present ownership, not as damages for the Government's past exercise of eminent domain.

■ In conclusion, this Court will not permit the plaintiffs to avoid the "carefully crafted limitations of the Quiet Title Act by characterizing [their] suit as a claim" under the Takings Clause. *Mottaz*, 476 U.S. at 844, 106 S.Ct. at 2230–31. Remaining true to plaintiffs' own allegations and assertions, this Court treats plaintiffs' complaint as one based on the QTA. Accordingly, Counts II and III are dismissed because the relief sought is not available under the QTA.[6]

### 2. The Quiet Title Act

Under the Quiet Title Act, Congress imposed certain conditions to its waiver of sovereign immunity. The Supreme Court has stated that "when Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed." *Block*, 461 U.S. at 287, 103 S.Ct. at 1820. For example, § 2409a(f) expressly states that an action under the QTA is time-barred unless it is filed within twelve years after the date it accrued. *See Block*, 461 U.S. at 287, 103 S.Ct. at 1820 ("When waiver legislation contains a statute of limitations, the limitations provision constitutes a condition on the waiver of sovereign immunity.") Section 2409a also provides that the jurisdiction of the district court ceases "[i]f the United States disclaims all interest in the real property or interest therein adverse to the plaintiff at any time prior to the actual commencement of the trial, which disclaimer is confirmed by order of the court." 28 U.S.C. § 2409a(e). The statute mandates that jurisdiction of the district court shall continue only if "it has jurisdiction of the civil action or suit on [a] ground other than and independent of the authority conferred by section 1346(f) of this title." *Id.* Subsection (e) reflects two important policy goals: (1) to ensure that questions regarding the Government's title to property are litigated in federal courts, and (2) to "minimiz[e] federal encroachment upon traditional state prerogatives as soon as the federal interest evaporates." *Bily v. Illinois Central Gulf Railroad Co.*, 637 F.Supp. 127, 131 (N.D.Ill.1986). *See also* House Report at 4555 ("Since we believe it is the better policy to litigate questions of the Government's title in the Federal courts, the draft bill provides for exclusive jurisdiction of suits under the statute in the United States District Courts.").

The Government and LIG argue that, pursuant to § 2409a(e), this Court's jurisdiction has ceased because the Government has disclaimed its interest in the real property or interest therein adverse to the plaintiffs. Indeed, Patricia C. Sigur's affidavit states that

---

**6.** Plaintiffs also assert that this Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the dispute involves actions taken by the government under the auspices of the EPCA, 42 U.S.C. § 6201, *et seq.* This is not a ground for jurisdiction because the QTA is the exclusive means by which claimants may challenge the United States' title to real property. *Block*, 461 U.S. at 287, 103 S.Ct. at 1819. Moreover, neither the EPCA, nor § 1331 waives the United States' sovereign immunity. The final ground of jurisdiction, supplemental jurisdiction over plaintiffs' state law claims, is discussed *infra* in section II.A.3.

the Government affirmatively disclaims all interests in the Weeks Island Pipeline and the servitudes and easements at issue in this case. She states that the disclaimer is based on the deed that the Government executed with LIG after plaintiffs, suit was filed. Decl. of Ms. Sigur, ¶¶ 6–7, 9. It is undisputed that the Government sold and conveyed to LIG, "as is" and "where is" under a quitclaim deed executed August 22, 1997 all title, right, and interest the Government had in the Pipeline and the perpetual easements for a sum of $22 million. Based on the deed and the Government's disclaimer, the defendants argue that the United States' limited waiver of sovereign immunity has ceased, and the Court must dismiss the case for lack of subject matter jurisdiction under 28 U.S.C. § 2409a(e).

■ Based on Fifth Circuit precedent, as well as statutory interpretation and policy, the Court concludes that § 2409a(e) does not strip this Court of subject matter jurisdiction under the QTA. The parties briefed extensively the applicability of *Delta Savings & Loan Association v. Internal Revenue Service*, 847 F.2d 248 (5th Cir.1988), and *Bank of Hemet v. United States*, 643 F.2d 661 (9th Cir.1981). The Court finds that *Delta Savings* is controlling authority in the Fifth Circuit over actions filed pursuant to § 2409a. In *Delta Savings*, the Fifth Circuit found that the case was a quiet title action because at issue was whether the United States failed to acquire good title to the property in question by reason of failing to tender an adequate amount when it sought to redeem the property. *Delta Savings*, 847 F.2d at 249 n. 1. The government claimed there was no jurisdiction because it relinquished its ownership interest in the property before it was served with the complaint. Quoting the Ninth Circuit's decision in *Bank of Hemet*, the Fifth Circuit stated that "the presence of a waiver of sovereign immunity should be determined as of the date the complaint was filed." *Id.* The court noted that the complaint was filed three days before the government sold the disputed property at public

auction, and it concluded that "[b]ecause the government still owned the property on [the date the complaint was filed], we find that section 2409a's waiver is applicable and hence that jurisdiction is proper under section 1346(f)." *Id.*

■ The Government argues that *Delta* is distinguishable because it involved tax liens and the claimant had filed a lis pendens before the government sold the property. The Court finds neither of these differences compelling. Indeed, while the plaintiffs here did not file a lis pendens when they filed their lawsuit, the government was served with the suit before the sale, and it does not dispute that it had actual knowledge of the suit, having received a copy of the complaint by fax, before it sold the property. The Fifth Circuit's holding, like the Ninth Circuit's in *Hemet*, appears designed to "permit [he plaintiff] to have its day in court, [and to] restrain [ ] any tendency on the part of the government to manipulate its position subsequent to the filing of the complaint so as to present a situation that falls between the cracks of applicable waiver statutes." *Bank of Hemet*, 643 F.2d at 665. In short, the rule announced by the Fifth Circuit applies if the United States has an interest in the property at the time the suit over title is filed, and it thereafter sells the property having reason to know of the dispute over its title.

This Court has not found, and the parties do not cite, any case in which the government sells the property in question subsequent to the filing of a quiet title action and then states that it has "disclaimed" its interest in the property, ousting the federal court of jurisdiction.[7] The Court concludes that such a disclaimer—*i.e.*, one based on the sale of the government's interest after the filing of a quiet title action—is not the type of disclaimer contemplated by § 2409a(e). *Black's Law Dictionary* defines a "disclaimer" as:

> The repudiation or renunciation of a claim or power vested in a person or which he

---

7. There are cases, however, in which § 2409a(e) has been invoked when the government sold the property in issue well before the suit was filed. *See, e.g., Lord v. Babbitt*, 991 F.Supp. 1150, 1157 (D.Alaska1997); *Bay Savings Bank v. Internal Revenue Service*, 837 F.Supp. 150, 154 (E.D.Va. 1993); *Lee v. United States*, 629 F.Supp. 721, 726 (D.Alaska 1985).

had formerly alleged to be his. The refusal, or rejection of an estate or right offered to a person. The disavowal, denial, or renunciation of an interest, right, or property imputed to a person or alleged to be his.

*Black's Law Dictionary* 464 (6th ed.1990). Selling or transferring an interest in property, in return for considerable consideration and after another party puts the ownership of the property in dispute, is not a disclaimer. Such an action does not renounce a claim that is allegedly his; rather, it is an affirmative assertion of an interest in the property.

The Court notes that neither the QTA nor its legislative history defines "disclaims" in any other fashion. Nor does either source provide guidance on the types of situations the disclaimer provision was designed to cover. However, this Court's interpretation of § 2409a(e) does not render the provision meaningless. Under this Court's interpretation of the disclaimer provision, federal courts could be divested of jurisdiction once it attaches if the government determines that it never had an interest in the disputed property or that, while it might have an interest, it does not wish to assert it. Here, the Government was made a party to a suit challenging its title to property; it then purported to sell the property, which plaintiffs claim it did not then own and could not transfer. The proper forum for the adjudication of the plaintiffs' claims is in federal court because the dispute puts the Government's actions at issue, not its purported transferee's. Further, resolution of this case requires a court to interpret the terms of an agreement between the plaintiffs and the government.

Even if the government's "disclaimer" qualified as a disclaimer under the QTA, the statute specifically requires the district court to confirm the United States' disclaimer of interest in the property. *See* 28 U.S.C. § 2409a(e) (jurisdiction of district court shall cease only if United States disclaims all interest *and* "disclaimer is confirmed by order of the court"). The legislative history of the QTA does not reveal what Congress intended this confirmation by the district court to entail. Some courts have interpreted the confirmation requirement as "a formality," while others have suggested that the disclaimer must be made in good faith. *Compare Madan v. United States,* 850 F.Supp. 148, 151 (N.D.N.Y.1994) (noting that confirmation was formality), *with Lee,* 629 F.Supp. at 726 (concluding that disclaimer was valid and made in good faith because conveyance of property prior to filing of plaintiffs' complaint was required by statute); *W.H. Pugh Coal Co. v. United States,* 418 F.Supp. 538, 539 (E.D.Wis.1976) (confirming United States' disclaimer but noting that "[i]f this were a situation in which the state and federal authorities were attempting to whipsaw the plaintiff and to harass it so as to avoid a resolution of this dispute, I would be reluctant to grant the dismissal").

In this case, both the Government and LIG were aware at the outset of their dealings of the dispute over title to the servitude. It is undisputed that the defendants were served with plaintiffs, complaint—in which the plaintiffs assert an interest in the property—before the sale to LIG was formally executed. The Court finds it highly likely that the Government's disclaimer was not made in good faith because it was done in an attempt "to whipsaw the plaintiff [s] and to harass [them] so as to avoid a resolution of this dispute," and with the intent to "manipulate its position subsequent to the filing of the complaint so as to present a situation that falls between the crack of applicable waiver statutes." *W.H. Pugh Coal Co.,* 418 F.Supp. at 539; *Bank of Hemet,* 643 F.2d at 665. Thus, if there is a "disclaimer" within the meaning of § 2409a(e), the Court refuses to confirm it and jurisdiction under §§ 2409a(e) and 1346(f) is proper.

### 3. Supplemental Jurisdiction

Both plaintiffs and LIG ask this Court to assert its jurisdiction over two state claims. Count VI of plaintiffs' complaint requests that this Court determine whether the Pipeline constitutes a corporeal immovable under Louisiana law and whether certain plaintiffs' agreements with LIG should be rescinded for lesion beyond moiety. In its answer filed on December 10, 1997, LIG included a counterclaim against a number of plaintiffs, seeking to exercise its powers under La.R.S. § 19:1,

*et seq.*, and La.R.S. 30:503, *et seq.*, to expropriate property necessary for its transportation of intrastate natural gas. LIG also filed a petition for expropriation in state court. Count VI of plaintiffs' complaint and LIG's petition for expropriation are both rooted in state law, and the only basis for this Court's jurisdiction over these claims is supplemental jurisdiction pursuant to 28 U.S.C. § 1367.[8]

The statute authorizing supplemental jurisdiction provides in pertinent part:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). It is well established that to be part of "the same case or controversy," each separate claim "must derive from a common nucleus of operative facts." *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). This Court believes that Count VI of plaintiffs' complaint and LIG's expropriation claims are not part of the same case or controversy under which original jurisdiction exists. As set forth above, the gist of plaintiffs' complaint is whether the servitudes granted to the Government by the plaintiffs have been terminated, extinguished, or abandoned as a result of the alleged nonuse of the Pipeline and the decommissioning of the Weeks Island Facility. The resolution of that question requires this Court to examine the Donation of Servitude and Easement, *i.e.*, the document between the plaintiffs and the Government in which the Government accepted and the plaintiffs donated certain easements and servitudes. Counts VI of plaintiffs' complaint and LIG's expropriation claim, on the other hand, involve different transactions and would require this Court to examine the conventional right-of-way and

servitude agreements between LIG and the plaintiffs. It is the Court's opinion that LIG's expropriation claim, Count VI, and the remainder of plaintiffs' claims are not derived from a common nucleus of operative facts as the plaintiffs' quiet title claims against the Government. Therefore, this Court will not exercise supplemental jurisdiction over Count VI or LIG's expropriation claim.

## B. Venue is Proper in the Eastern District of Louisiana

Plaintiffs' lawsuit is a civil action to quiet title under § 2409a. Thus, 28 U.S.C. § 1402(d) provides:

> Any civil action under section 2409a to quiet title to an estate or interest in real property in which an interest is claimed by the United States shall be brought in the district court of the district where the property is located or, if located in different districts, in any of such districts.

28 U.S.C. § 1402(d). The Court agrees with the plaintiffs that the statute focuses on the location of the property in which the United States claims an interest, not on the location of the named plaintiffs' property. At the time this lawsuit was filed, the Government claimed an interest in a continuous pipeline and certain servitudes that began in St. James Parish in the Eastern District and ran to Iberia Parish in the Western District. Venue is proper in either the Eastern or Western Districts because the Government claimed an interest in property that was located in both districts. Further, the Court finds that the Eastern District is a convenient forum for all parties. Therefore, defendants' motion for change of venue is denied.

## C. The Government's Rule 12(b)(6) Motion to Dismiss

The plaintiffs initiated this lawsuit in order to determine whether the servitudes granted to the Government have been terminated, extinguished, or abandoned as a result of the

---

**8.** LIG also argues that its expropriation claim comes within the jurisdiction of this Court because it is a compulsory counterclaim under Rule 13(a) of the Federal Rules of Civil Procedure. However, compulsory counterclaims that do not have an independent basis of federal subject matter jurisdiction cannot be heard by this Court unless they fall under this Court's supplemental jurisdiction.

alleged non-use of the pipeline and the decommissioning of the Weeks Island Facility. As the Court noted above, the plaintiffs allege that the servitudes have expired and/or terminated because: (a) the Government has permanently discontinued the use of the servitudes for the purpose for which they were granted; (b) the servitudes were executed subject to the condition that it would be used solely in connection with the SPRP; (c) the Government has decommissioned the Weeks Island Facility and Pipeline; and (d) the Government has renounced the servitudes. Compl. ¶ 42. The plaintiffs contend that as a consequence of these actions, the Government has abandoned the easement and the Pipeline.

In their Rule 12(b)(6) motion, the Government relies upon a case from the Eleventh Circuit, *United States v. 434.00 Acres of Land*, 792 F.2d 1006 (11th Cir.1986), and argues that the only way the United States may be divested of a property interest such as an easement is in a manner approved by Congress. Specifically, for the federal property interest to expire, the Eleventh Circuit concluded that property "must be declared surplus property available for disposal through sale, lease, transfer or other express act and attended by the usual transfer of title documents." *434.00 Acres of Land*, 792 F.2d at 1009.[9]

The Government's reliance on this argument is misplaced. In this case, the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. § 6201, *et seq.*, expressly provides the Government with the authority to acquire and/or dispose of land or interests in land to the extent necessary to implement the Strategic Petroleum Reserve Plan. Notably, § 6239(f)(5)(B) grants the Secretary of Energy the power to "acquire by purchase, condemnation, or otherwise, land or interests in land for the location of storage and related

facilities," and § 6239(f)(5)(G) allows the Secretary to "execute any contracts necessary to carry out the provisions of such Strategic Petroleum Reserve Plan."[10]

Pursuant to this authority, the Government bound itself to the terms of the Donation, and the Court can think of no reason that the Government's agreement should not be enforced. Here the Donation was accepted by a representative of the Department of Energy pursuant to the EPCA. The Donation specifically provides for the causes for termination of the easement:

This donation is made and accepted for and in consideration of Grantors' desire to aid their country in the establishment of a Strategic Petroleum Reserve and in further consideration of Grantee's agreement to construct and operate said pipeline in accordance with the following specific requirements:

1. The rights herein donated to Grantee shall expire, terminate, and cease and this act shall be rendered null, void and unenforceable on December 31, 1981 if by such date Grantee shall have not commenced construction of the Strategic Petroleum Reserve pipeline.

2. The causes for termination of this easement shall include, but not be limited to, the following: (a) abandonment, (b) removal of the pipeline, (c) ten years non-use, or (d) execution of an affidavit by an authorized representative of the United States of America stating that the pipeline has been abandoned. Upon termination for any reason the United States of America shall have the election at its sole discretion of abandoning the pipeline and related improvements in place or removing it at its own expense. Such removal, if so elected, shall be complet-

9. The Government also suggests that the Government cannot be deprived of its property interests under state law principles designed for private disputes. The legislative history of the Quiet Title Act suggests otherwise. *See* House Report at 4555 (stating belief that uniformity as to plaintiff's qualifications for instituting suit was desirable but that "[t]he State law of real property would of course apply to decide all questions not covered by Federal law").

10. Indeed, the Government itself recognized this statutory authority in the Quitclaim Deed between itself and LIG. The Deed states that "[t]he DOE is authorized to sell the Property under and pursuant to authority contained in the [EPCA], including without limitation, 42 U.S.C. 6239(f)." Quitclaim Deed at 2, ¶ 2.

ed within one year after termination. If abandonment in place is elected, Grantee shall have no claim against Grantors for compensation or damages, and the pipeline and related improvements shall become the property of the Grantors without any payment to the Grantee.

Donation at 5.

This case involves questions of contract interpretation as to whether the Government abandoned the Pipeline and servitudes prior to the sale to LIG within the meaning of the Donation. Unlike the situation in *434.00 Acres of Land*, the terms of the Donation contain express conditions for termination. *See 434.00 Acres of Land*, 792 F.2d at 1008 n. 3 (distinguishing authority in which government's easement was subject to specific conditions for termination); *cf. Lethin v. United States*, 583 F.Supp. 863, 870–74 (D.Or. 1984) (reviewing donation of easement to United States and whether language in deed limited easement to use described in deed, thereby terminating government's interest) Accordingly, the Government's motion to dismiss under Rule 12(b)(6) is without merit, and it is denied.

### III. CONCLUSION

For all of the foregoing reasons, IT IS ORDERED that:

1. Defendants' motions to dismiss for lack of subject matter jurisdiction are DENIED.

2. Counts II and III of plaintiffs' complaint are DISMISSED.

3. Defendant LIG's motion to transfer venue is DENIED.

4. Count VI of plaintiffs' complaint and LIG's expropriation claim are dismissed for lack of subject matter jurisdiction.

5. The Government's Rule 12(b)(6) motion to dismiss is DENIED.

6. The Court is of the opinion that the above order finding jurisdiction under the Quiet Title Act involves a controlling question of law as to which there is substantial ground for difference of opinion, and an immediate appeal from the order may materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b). Accordingly, the parties may apply to the Fifth Circuit Court of Appeals for an appeal of this interlocutory order, pursuant to 28 U.S.C. § 1292(b), within ten days from the date of this Order. If such application is timely made, these proceedings are stayed pending the outcome of the appeal. If such application is not made, this Court will review the motions for summary judgment and proceed with the class certification proceedings.